United States Court of Appeals,

Fifth Circuit.

No. 90–2958.

WILFRED ACADEMY OF HAIR AND BEAUTY CULTURE, HOUSTON, TEXAS, et al., Plaintiffs–Appellees,

v.

THE SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS, et al., Defendants–Appellants.

April 6, 1992.

Appeal from the United States District Court for the Southern District of Texas.

Before THORNBERRY, DAVIS and WIENER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The Southern Association of Colleges and Schools (SACS) and the Commission on Occupational Education Institutions (COEI) appeal the district court's order, 738 F.Supp. 200, granting injunctive relief and awarding attorney's fees and costs in favor of Wilfred Academy of Hair and Beauty Culture (Wilfred). The district court found that COEI arbitrarily and capriciously denied Wilfred reaccreditation and, therefore, enjoined COEI from dropping Wilfred's accreditation for the reasons alleged, or for any other reasons, for one year. We conclude that the district court did not afford the accrediting commission's decision sufficient deference and erred in issuing the injunction. We therefore reverse the court's judgment and vacate its award of fees and costs.

I.

SACS, a Georgia corporation, is one of six regional educational accrediting associations, recognized by the Department of Education. SACS is governed by its members, each of whom has a vote in the association's annual business meeting. Accreditation by a recognized accrediting agency, such as SACS, is a prerequisite for an institution's students to receive federal financial assistance. 34 C.F.R. Part 600.

Within SACS, four specialized commissions set educational standards and make accreditation decisions. COEI, one of these four commissions, accredits post-secondary, non-degree granting institutions, commonly known as "technical institutes." In 1988–89, COEI included 422 full members and 48 candidates for accreditation.

A Delegate Assembly, comprised of representatives from each of COEI's member institutions, governs COEI and has final responsibility for all aspects of COEI's operation. The Delegate Assembly sets COEI's *Policies and Standards,* which serves as the basis for all accreditation decisions. Every member participates in setting the *Policies and Standards,* and membership obligates an institution to follow the association's rules to maintain accreditation. The Delegate Assembly also elects a 19–member Commission to apply the *Policies and Standards,* making decisions to approve, withhold, or withdraw accreditation.

The appellee schools are six unincorporated cosmetology schools, operated under the name Wilfred Academy of Hair and Beauty Culture in Florida, Texas, and California. Wilfred forms part of a much larger corporation, Wilfred America Education Corporation, headquartered in New York. COEI first accredited Wilfred's main campus in Tampa in 1982 and subsequently accredited the five remaining appellee schools and seven others as branches.

Accreditation represents recognition by member institutions that each member meets COEI's *Policies and Standards.* Accreditation involves a dual process of self-evaluation and evaluation by COEI members, designed to help a candidate for membership meet the association's requirements for membership. Once a school becomes an accredited member, it must reaffirm its accreditation approximately every five years by conducting a new self study and by hosting an on-site inspection. In evaluating an institution for accreditation, COEI relies primarily on the institution's self-reporting.

In March 1988, COEI conducted an on-site inspection of Wilfred's campuses to determine

whether to reaffirm Wilfred's accreditation. On May 19, 1989, after efforts to correct problems first discovered the previous year had failed, COEI dropped Wilfred's accreditation for violating COEI's dual accreditation, refund, and disclosure policies and for failing to submit an annual report for 1986. Wilfred appealed this decision, but COEI's Appeals Board affirmed the Commission's decision on all but the last alleged violation.

Wilfred subsequently brought suit against SACS and COEI, in Texas state court, to enjoin SACS from disaccrediting its schools. SACS removed this action to federal district court, where a bench trial was held in January 1990. In October 1990, the district court issued its judgment, enjoining SACS from withdrawing Wilfred's accreditation for any of the alleged violations underlying the Commission's decision. In addition, the court enjoined SACS "from taking any adverse actions" against Wilfred's accreditation for one year from the date of the judgment. The court also awarded Wilfred attorney's fees and costs.

After the court's injunction issued, SACS moved to modify that part of the injunction which prevented SACS from taking any action against Wilfred for a year. SACS supported its motion in part by allegations that Wilfred's parent corporation and numerous employees, including top management, had pled or been found guilty of over 100 federal felonies. Some of these felonies involved fraudulently obtaining or spending federal student loans. SACS presented the plea agreement of one of Wilfred's officers, Guido Sanchez, who was active in the management of Wilfred's Florida operations. In his plea, Sanchez admitted that he had made a number of materially false statements in the Tampa campus's original accreditation application to SACS. For reasons best known to the district judge, the court denied SACS's motion, preventing SACS from investigating potentially serious violations of COEI's *Policies and Standards*. SACS timely appealed the court's judgment.

II.

While this appeal was pending, however, five of the six appellee schools closed, including the main campus in Tampa, and Wilfred voluntarily relinquished SACS accreditation of the sixth school. Consequently, even if we vacated the court's injunction SACS could not take any action to affect the appellees' accreditation because the only remaining school is no longer accredited by SACS. As a result, the issue of the schools' accreditation has become moot. *See In re Talbott Big Foot, Inc.,* 924 F.2d 85 (5th Cir.1991) (defendant's agreement to establish a trust fund for the claimants made the issue of limiting the defendant's liability moot); *In re Sullivan Cent. Plaza, I, Ltd.,* 914 F.2d 731 (5th Cir.1990) (absent a stay pending appeal, appeal from bankruptcy court's orders, granting creditors relief from stay and withdrawing injunction in debtor's favor, was moot after creditor foreclosed and purchased property at issue).

Ordinarily, once the substantive issue before us is moot, our consideration of the appeal ends. The district court, however, in addition to granting injunctive relief, also awarded Wilfred attorney's fees, under § 38.001 of the Texas Civil Practice and Remedies Code, and costs.[1]  Under Texas law, an issue of attorney's fees keeps a suit alive even if the underlying merit issues have become moot. *See Camarena v. Texas Employment Comm'n,* 754 S.W.2d 149 (Tex.1988).  In *Camarena,* farm workers sued the Texas Employment Commission (TEC), petitioning the court to declare the agricultural exemption of the Texas Unemployment Compensation Act (TUCA) unconstitutional. The trial court granted declaratory and injunctive relief in the farm workers' favor but found that the state was immune from paying attorney's fees. Thereafter, the Texas Legislature amended the act to provide coverage for farm workers. On appeal, the court of appeals found the trial court's judgment granting relief to be moot. The Texas Supreme Court reversed, holding that:

> Clearly a controversy exists between the farm workers and TEC. The "live" issue in controversy is whether or not the farm workers have a legally cognizable interest in

---

[1]SACS argues that Georgia law should govern these proceedings and that Georgia law would not support an award of attorney's fees in this case.  Our decision today to reverse the district court on the merits obviates the need to address this concern because under Texas law Wilfred is no longer a prevailing party and, therefore, has no claim to fees.

> recovering their attorney's fees and costs.  The fact that the Legislature wisely undertook action to bring the farm workers within the scope of TUCA does not moot or void the workers' interest in obtaining attorneys [sic] fees and costs for the successful disposition of their claim.... the attorney's fees issue ... breathes life into the appeal.  Due to the existence of the "live" issue of attorney's fees and costs we hold that the suit was not moot.

*Id.* at 151.

Similarly, here, the closing of five of the schools and Wilfred's relinquishing accreditation of the sixth does not void Wilfred's interest in recovering fees and costs.  We must reach the merits in this case because a decision in SACS's favor would vitiate the district court's award of fees against SACS.

## III.

Before addressing the merits of the case, we must first consider the proper scope of review for a court reviewing an accreditation decision made by a voluntary association.  SACS argues that the district court incorrectly looked to federal common law to determine the proper scope for reviewing COEI's decision to drop Wilfred's accreditation.  SACS contends that, under the Texas conflict of laws rules, the court should have applied the standards adopted by Georgia for reviewing decisions of voluntary associations because Georgia has the most significant contacts to this dispute. We need not resolve this conflict of laws question, however, because SACS's argument raises a false conflict.

Federal courts have consistently limited their review of decisions of accrediting associations to whether the decisions were "arbitrary and unreasonable" and whether they were supported by "substantial evidence."  *See, e.g., Medical Institute of Minnesota v. National Ass'n of Trade and Technical Sch.,* 817 F.2d 1310, 1314 (8th Cir.1987); *Rockland Inst. v. Association of Indep. Colleges and Sch.,* 412 F.Supp. 1015, 1016 (C.D.Cal.1976).  Neither Georgia nor Texas law differs significantly from the above rule.  *See Golden Star of Honor v. Worrell,* 158 Ga. 309, 123 S.E. 106 (1924); *Hoey v. San Antonio Real Estate Bd., Inc.,* 297 S.W.2d 214, 217 (Tex.Civ.App.—San

Antonio 1956, no writ). Therefore, we need not determine whether we should apply Georgia or Texas law rather than the rule adopted by a number of federal courts.

In reviewing an accrediting association's decision to withdraw a member's accreditation, the courts have accorded the association's determination great deference. *Medical Inst. of Minnesota,* 817 F.2d at 1314; *Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Sch.,* 432 F.2d 650, 657 (D.C.Cir.), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970). Courts give accrediting associations such deference because of the professional judgment these associations must necessarily employ in making accreditation decisions. In considering the substance of accrediting agencies' rules, courts have recognized that "[t]he standards of accreditation are not guides for the layman but for professionals in the field of education." *Parsons College v. North Cent. Ass'n of College and Secondary Sch.,* 271 F.Supp. 65, 73 (N.D.Ill.1967). Consequently, courts are not free to conduct a *de novo* review or to substitute their judgment for the professional judgment of the educators involved in the accreditation process. *Medical Inst. of Minnesota,* 817 F.2d at 1315; *Rockland Inst.,* 412 F.Supp. at 1019. Instead, courts focus primarily on whether the accrediting body's internal rules provide a fair and impartial procedure and whether it has followed its rules in reaching its decision.

We turn now to Wilfred's alleged violation of COEI's dual accreditation policy, one of the violations on which COEI predicated its withdrawal of accreditation.

IV.

Schools may receive accreditation from more than one accrediting association. As a result, COEI's *Policies and Standards* includes a dual accreditation policy requiring each accredited institution to "describe itself in identical terms to each recognized accrediting body with regard to purpose, governance, programs, degrees, diplomas, certificates, personnel, finances, and constituents, and [ ] keep each accrediting body apprised of any change in its status with one or another accrediting

body." 1988 *Policies and Standards* at 19, F. Dual Accreditation. This policy did not take effect until July 1988, but the 1987 *Policies and Standards* similarly provided that "[a]n institution accredited as a branch by [COEI] may not be accredited as an independent institution by another accrediting agency." 1987 *Policies and Standards* at 27. In addition, the 1988 *Policies and Standards* includes as a requirement of eligibility that "[b]ranches or extensions of institutions applying for candidate for accreditation must not be accredited as a free-standing institution by another accrediting agency." 1988 *Policies and Standards,* No. 16 at 17.

The district court concluded that the dual accreditation policy serves no rational purpose. We disagree. Initially, we note that it is not clear that probing into the association's motives behind its rules represents a proper subject for our inquiry. As we explained in Part III, in reviewing a voluntary association's decision, we restrict our review to whether the association has acted "arbitrarily" or "unreasonably" in light of its policies. Nevertheless, assuming *arguendo* that we may inquire into the association's motives, that inquiry must remain limited. Having reviewed the record, we find that COEI has clearly demonstrated a genuine concern in requiring identical reporting to various accreditation bodies.

First, the six regional accrediting associations have agreed to limit their accrediting authority for main campuses to institutions within their respective regions.[2] COEI, as a part of SACS, may only accredit a campus outside of its geographic area as a branch of a main campus located within its area of authority. See 1988 *Policies and Standards,* at 25, N. Accreditation Policy Relative to Branches or Extensions. Wilfred does not contest this limited authority. Thus, COEI must be able to rely confidently on a candidate for branch accreditation's representation that the school is a legitimate branch of a main campus within SACS's region.

---

[2]SACS's region includes: Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, and Virginia. Proceedings of the Southern Association of Colleges and Schools, vol. 41, no. 2, March–April 1989, pp. 7–8.

Second, COEI has a legitimate interest in knowing a school's true status because its *Policies and Standards* makes it easier and faster to receive branch-campus accreditation. Finally, this policy promotes COEI's overriding concern for accurate reporting. As we discussed in Part I, accrediting bodies rely heavily on member institutions' self-reporting in making accreditation decisions. Allowing institutions to report their organizational status differently to take advantage of various eligibility requirements undermines this effort.

In March 1988, the evaluation team discovered that another accrediting agency had accredited some of Wilfred's branches as independent institutions. The team notified Wilfred of this violation in its team report, but Wilfred did not address this concern in its response. As a result, the Commission delayed reaffirmation of Wilfred and requested that Wilfred provide documentation by January 31, 1989 from its other accreditor, the National Accrediting Commission of Cosmetology Arts and Sciences (NACCAS), "identifying the locations of Wilfred Academy in identical terms as is with [COEI] regarding main and branch campus designation (see 1988 *Policies and Standards of COEI,* p. 18, F. Dual Accreditation)."

Wilfred did not respond until February 2, 1989 because the original letter was apparently lost in the mail. When Wilfred did answer, it provided no information on whether Wilfred had designated the campuses as main or branch campuses for the purpose of NACCAS accreditation. The Commission then sent Wilfred another request for this information, informing Wilfred that time was of the essence so Wilfred should respond by facsimile mail. Instead, on March 20, 1989, Wilfred responded by regular mail, admitting that NACCAS had accredited nine of its branches as freestanding. Wilfred failed to inform COEI, however, that Wilfred had applied to NACCAS for accreditation of two branches, recently accredited by COEI, as branches of a different main campus. COEI contends that, in fact, all of Wilfred's schools appear to have been branches of the corporate headquarters in New York.

On March 27, 1989, COEI issued Wilfred a Notice to Show Cause within thirty days why COEI should not drop Wilfred from accreditation for this violation. Wilfred responded on April 26, 1989, stating that it had had no notice of this policy and that if the Commission believed there to be a violation it would immediately apply for freestanding status. Despite this promise, Wilfred did not apply immediately for freestanding status. COEI terminated Wilfred's accreditation on May 19, 1989, almost two months after the Notice to Show Cause. Wilfred, in fact, applied for freestanding accreditation on May 18, 1989, but COEI did not receive Wilfred's application prior to its decision to drop Wilfred's accreditation. Wilfred appealed this decision, offering to relinquish accreditation under protest, but the Appeals Board found this "too little to late." In fact, COEI's *Policies and Standards* provides that the Appeals Board will not consider any evidence of compliance following the Commission's action. 1988 *Policies and Standards,* No. 2 at 23.

Despite clear evidence of a violation, the district court found the policy's language vague, not requiring identical reporting of an institution's status, and serving no rational purpose. These findings wholly disregard the deference due to the association's accreditation decisions. Having carefully reviewed the record, it is apparent that Wilfred does not so much deny that it violated COEI's dual accreditation policy as it attempts to explain why it violated the policy. Faced with a similar situation, the Eighth Circuit, in *Medical Inst. of Minnesota,* commented:

> MIM's arguments are self-defeating. While trying to explain why it didn't comply with NATTS' standards, MIM admits each violation. As stated previously, MIM was given every opportunity to justify its problem areas. Apparently, NATTS did not agree that MIM's problems were justified. It is neither our nor the district court's role to reweigh the evidence in this case.

817 F.2d at 1315.

Wilfred participated in the adoption of these rules as a member of the Delegate Assembly and, as a member of COEI, should be charged with knowledge of them. Moreover, even after COEI made Wilfred fully aware of the violation, the school did not act immediately to cure the problem.

Substantial evidence supports COEI's decision to withdraw accreditation because of Wilfred's violation of the dual accreditation rules. We need not consider the other alleged violations because COEI may withdraw an institution's accreditation for violating any of COEI's policies. Because the district court's injunction was erroneously issued, Wilfred is no longer a prevailing party entitled to recover fees or costs. *See Kold–Serve Corp. v. Ward,* 736 S.W.2d 750, 756 (Tex.App.—Corpus Christi 1987). We therefore vacate the district court's award of attorney's fees and costs.

REVERSED AND VACATED.