## CHICAGO SCHOOL OF AUTOMATIC TRANSMISSIONS, INC., Plaintiff–Appellant,

v.

## ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES, Defendant–Appellee.

No. 94–2696.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1994.

Decided Dec. 27, 1994.

Stephen A. Glickman, Cary S. Fleischer (argued), John M. Foley, Chuhak & Tecson, Chicago, IL, for plaintiff-appellant.

John A. Knight, Kenneth P. Taube, Rothschild, Barry & Myers, Chicago, IL, J. Brian DeBoice (argued), Mark L. Pelesh, Cohn & Marks, Washington, DC, for defendant-appellee.

Before REAVLEY,* EASTERBROOK, and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

Loans guaranteed by the federal government are available to persons who attend accredited trade schools. Federal agencies do not accredit schools; instead they accredit accrediting agencies, which apply standards of their own devising but satisfactory to the national government. The Accreditation Alliance of Career Schools and Colleges, an approved accrediting agency, declined to renew the accreditation of the Chicago School of Automatic Transmissions, Inc., which promptly went out of business—as very few people were willing to pay their own money for its services. The School sued the Alliance, seeking as damages the federally underwritten tuition it lost. (Actually the School sued a predecessor to the Alliance; we use the current name for clarity.) Magistrate Judge Lefkow recommended a grant of summary judgment to the Alliance, 1994 WL 758340, 1994 U.S. Dist. LEXIS 4105, and the district court entered judgment on the basis of her report.

■ The School sees this as a contract case, to be decided under Illinois law. By applying for accreditation and sending in its fee, the school believes, it accepted the Alliance's offer, the terms of which were established by the Alliance's rules and bylaws.

* Hon. Thomas M. Reavley, of the Fifth Circuit, sitting by designation.

According to the School, the Alliance did not comply with its own rules, thereby breaking its promise and becoming liable to pay contract damages. The Alliance sees this as a demand for review under the principles of administrative law. Accreditation serves a federal function, and two years ago (shortly after the commencement of this action under the diversity jurisdiction) Congress provided for exclusive federal jurisdiction of any suit by a school or college protesting the denial or withdrawal of accreditation by "an accrediting agency or association approved by the Secretary" of Education. 20 U.S.C. § 1099b(f). Congress did not specify a source of law for these suits, but it is hard to see how state law could govern when federal jurisdiction is *exclusive*. It is hard enough to be a ventriloquist's dummy in diversity suits under *Erie;* it is all but impossible to see how federal courts could apply state law to the actions of accrediting agencies when state courts have been silenced by the provision for exclusive jurisdiction. If a grant of federal jurisdiction sometimes justifies creation of federal common law, see *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); cf. *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), a grant of exclusive federal jurisdiction necessarily implies the application of federal law. Although the admiralty jurisdiction is not similarly all-encompassing, the Supreme Court has treated it, too, as a fount of federal law. See David P. Currie, *Federalism and the Admiralty,* 1960 Sup.Ct.Rev. 158 (discussing the cases). The School does not offer any reason for a contrary decision here.

■ Courts could in principle derive federal law from the common law of the states, see *O'Melveny & Myers v. FDIC,* — U.S. —, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), but accrediting bodies are not engaged in commercial transactions for which state-law contract principles are natural matches. The "contract" the School wants to enforce is not a bargained-for exchange but a set of rules developed by an entity with many of the attributes of an administrative agency. Accreditation groups adopt and change their rules unilaterally; by posting an application fee a trade school cannot lock in a favorable set of rules. One set of rules applies nationwide (implying that if any non-federal law should be absorbed, it would be the law of the District of Columbia, where the Association has its headquarters, rather than the law of the applicants' states). Although the law of every state contains a set of rules for the conduct of voluntary associations, distinct from the law of contracts, this too is not quite the right match; the School did not apply to "join" the Alliance. It wanted a key that would unlock the federal Treasury. An accrediting agency is a proxy for the federal department whose spigot it opens and closes.[1] If accreditation—which the Secretary of Education treats as a sort of license or certificate—were bestowed by the federal agency directly, no one would suppose that state law governed. Instead the Administrative Procedure Act would govern judicial review, and the court would inquire whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or reached "without observance of procedure required by law", 5 U.S.C. § 706(2)(A), (D).

Many courts applied these principles of administrative law to accreditation decisions before the enactment of § 1099b(f), although usually without explicit recognition of the choice-of-law implications. E.g., *Medical Institute of Minnesota v. National Association of Trade and Technical Schools,* 817 F.2d 1310, 1314–15 (8th Cir.1987). Others used the APA's approach after asserting that state law is functionally identical. E.g., *Wilfred*

---

1. Which is not at all to imply that an accrediting agency is a "state actor" or "federal actor" with special constitutional obligations in addition to those created by statutes and common law. A governmental body may rely on the decisions of a private association without turning that association into "the government" itself. See *Sanjuan v. American Board of Psychiatry & Neurology,*

*Inc.,* 40 F.3d 247, 250 (7th Cir.1994). It is the Secretary of Education, and not the Alliance, that must conform the government's ultimate decision to the Constitution. The School does not raise any constitutional argument; we mention this point only to guard against reading into our opinion something that it does not contain.

*Academy of Hair & Beauty Culture v. Southern Association of Colleges & Schools,* 957 F.2d 210, 214 (5th Cir.1992). We wonder whether an equation between the APA and state law is apt; administrative law entails deferential review, while courts applying contract law do not defer to either of the contracting parties' views. Remedial differences also loom large. It is unnecessary to elaborate. We think that principles of federal administrative law supply the right perspective for review of accrediting agencies' decisions. Section 1099b(f) cements the case for the application of federal law. *Keams v. Tempe Technical Institute, Inc.,* 39 F.3d 222 (9th Cir.1994), which held that federal law does not preempt tort claims under state law by trade school students pursuing a theory of "wrongful accreditation," does not mention § 1099b(f), which governs only the *denial* of accreditation. One may doubt whether it is sensible to use federal law to address denials of accreditation and state law to address grants of accreditation, but whether to follow *Keams* is a subject for another day.

The Alliance yanked the School's accreditation after concluding that it had not complied with several rules. Only one concerns us now: the requirement that trade schools promptly refund the tuition of students who withdraw. The School concedes that it routinely took months to make refunds. During the initial round of examination and review, the School blamed this on negligence by the back office staff. The Accrediting Commission (the Alliance's governing body) removed the School's accreditation, ruling that persistent negligence is intolerable. At the School's request, the Commission appointed a three-member Appeals Panel. In presenting its case to the Appeals Panel, the School changed course. It now asserted that the delay had been deliberate, a tactic to encourage students to stay in school, and it promised to change its ways if the Alliance so demanded. The Appeals Panel accepted this explanation and remanded to the Commission.

Proceedings before the Panel are governed by Document G of the Commission's standards. At the time, Document G permitted an Appeals Panel to consider new evidence that was "in existence at the time of the Commission action ... but ... not presented to the Commission because of an honest mistake or misunderstanding by the school."[2] The School did not argue that its change of position—presented by way of new evidence—was either "in existence at the time of the Commission action" or that it had remained undisclosed "because of an honest mistake or misunderstanding". Under Document G, therefore, the Appeals Panel was not entitled to receive or consider the new evidence. Acting on the remand, the Commission ruled that the evidence had not been properly received. Unimpressed by the School's about-face, the Commission adhered to its original decision. And because the School had no additional arguments to make, the Commission put its decision into effect without affording the School a second go-round with an Appeals Panel. As the School sees things, this violated two rules: the provision of Document G permitting an Appeals Panel to receive new evidence, and the promise in other bylaws that decisions could be reviewed by an Appeals Panel.

If this were a contract dispute, we would have to make an independent judgment about the meaning of Document G and the Alliance's internal operating procedures. In administrative law, however, the first question is how the agency understands its own rules—for an agency possessed of the ability to adopt and amend rules also may interpret them, even if the interpretation chosen is not the one that most impresses an outside observer. See *Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993); *Homemakers North Shore, Inc. v. Bowen,* 832 F.2d 408, 411–13 (7th Cir.1987). The Alliance understands its rules to permit the nine-member Commission (the Alliance's ultimate govern-

2. Document G was revised after the events of this case to bar the presentation of new evidence to an Appeals Panel; the amendment does not apply to these proceedings. Document G originally permitted the consideration of new evidence pertaining to an issue "as to which the school had not had an opportunity ... to make its position known." That provision is irrelevant, so we disregard it in the text.

ing body) to review decisions of the three-member Appeals Panels. Members of the Commission, and all three members of the Appeals Panel, submitted affidavits to this effect. Although the School invites us to analogize the Commission to a district court and the Appeals Panel to a court of appeals, an association need not organize itself in this fashion. Universities regularly allow "appeals" of tenure decisions to bodies that turn out to have the power to recommend but not decide; it is not surprising to find other academic institutions employing a similarly non-judicial understanding of "appeal." That an Appeals Panel was entitled under Document G to decide whether to receive new evidence no more freed it from the ultimate control of the Commission than a district court's ability to accept evidence under the Federal Rules of Evidence frees it from scrutiny by a court of appeals. The Alliance did not act arbitrarily, and it did not violate any of its rules, in treating the decision of the Appeals Panel as subject to review, in turn, by the full Commission.

■ The School protests that it was entitled to another crack at an Appeals Panel. But it had no new evidence to offer (none, that is, that an Appeals Panel could have considered), and there was therefore no point to additional proceedings. If the Commission's refusal to allow a second appeal was a departure from the Alliance's rules, it was a harmless departure. This, too, is something all three members of the Appeals Panel informed the district court; each asserted that further proceedings on the same record were fated to end in a denial of accreditation no matter who last signed off. Harmless deviations from prescribed procedures do not lead to the whopping damages the School requests, so the judgment of the district court is

AFFIRMED.