RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0084P (6th Cir.)
File Name: 01a0084p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

FOUNDATION FOR INTERIOR
DESIGN EDUCATION
RESEARCH,
            *Plaintiff-Appellee,*

            *v.*

SAVANNAH COLLEGE OF ART
& DESIGN,
            *Defendant-Appellant.*

No. 99-2122

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 98-00346—Gordon J. Quist, District Judge.

Argued: November 2, 2000

Decided and Filed: March 27, 2001

Before: MERRITT, WELLFORD, and SILER, Circuit
Judges.

---

**COUNSEL**

**ARGUED:** Frank G. Smith III, ALSTON & BIRD, Atlanta,
Georgia, for Appellant. Douglas M. Mangel, DRINKER,
BIDDLE & REATH, Washington, D.C., for Appellee.

1

**ON BRIEF:** Frank G. Smith III, Peter M. Degnan, Anne S. Rampacek, ALSTON & BIRD, Atlanta, Georgia, David L. Harrison, TOLLEY, VANDENBOSCH, WALTON, KOROLEWICZ & BRENGLE, Grand Rapids, Michigan, for Appellant.  James A. Meyers, DRINKER, BIDDLE & REATH, Washington, D.C., for Appellee.

MERRITT, J., delivered the opinion of the court, in which SILER, J., joined.  WELLFORD, J. (pp. 20-21), delivered a separate concurring opinion.

————————————

**OPINION**

————————————

MERRITT, Circuit Judge.  The Foundation for Interior Design Education Research brought an action seeking a declaratory judgment that it did not violate the rights of Savannah College of Art & Design in denying accreditation to the College's interior design program.  Savannah College of Art appeals the district court's decision granting summary judgment to the Foundation on its claim and dismissing the College's antitrust, breach of contract, common law due process, breach of fiduciary duty, and fraud counterclaims.  We affirm the district court's decisions on all claims.

### I. Facts

Savannah College of Art & Design, a private, non-profit institution located in Savannah, Georgia, offers a variety of educational programs in the fields of art and design, including interior design.  The College is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools.  The Foundation for Interior Design Education Research, also a non-profit organization, is the sole accrediting body for interior design education programs in the United States. The Foundation is organized under the laws of New York.  It is located in Grand Rapids, Michigan.

In January 1995, the College applied to the Foundation for accreditation of the College's interior design program. In April 1995, the Foundation sent a group of three interior design practitioners/educators to the College to conduct an evaluation of the College's interior design program. The visiting team prepared a report that generally praised the College's program, but that recommended a denial of accreditation. The team based its recommendation on deficiencies it found in ten areas of "student achievement" at the College. The Foundation's accreditation committee reviewed both the team's report and comments from the College in response to the report. Three members of that committee responded to the report. One member agreed with the visiting team's recommendation; two others disagreed with the recommendation. One of the committee members who disagreed with the visiting team found that "the report is written in such a manner that it sets the program up for denial."

The Foundation's board of trustees, the organ responsible for making accreditation decisions, reviewed the team report, the College's comments, and the comments of members of the accreditation committee. The board decided to deny the College's application for accreditation on August 22, 1995. The College appealed this decision to the Foundation's internal board of appeals. The Foundation's board of appeals determined that the visiting team's findings concerning the College's student achievement deficiencies were not sufficiently substantiated in the team report, and it decided that the board of trustees should reconsider the College's application. Upon reconsideration, the Foundation's board of trustees recommended that the Foundation conduct a second on-site evaluation of the College's interior design program.

The Foundation conducted a second on-site evaluation of the College in December 1996. The second team of visitors to the College did not include any members of the first visiting team, and it did not read the first team's report before visiting the College. The second team identified deficiencies

in twenty areas of "student achievement" at the College, and it recommended that the Foundation reject the College's application for accreditation of its interior design program. The accreditation committee then reviewed a combination of the reports prepared by both visiting teams. Five members of the accreditation committee responded to the combined report; each agreed that the Foundation should deny the College's application. The Foundation's board of trustees denied the College's application once again, and it informed the College of this decision on August 25, 1997.

The College appealed the Foundation's second decision to deny accreditation to the Foundation's appeal panel, the successor organ to the board of appeals. At this time, the College also demanded that the Foundation provide the College with its accreditation reports dating from 1994 forward to enable the College to prove that it had been disparately treated. The Foundation refused this demand. The College then submitted to the appeal panel eleven of the Foundation's accreditation reports that it had obtained from other sources. On April 22, 1998, the appeal panel notified the College that, based on its finding that the board's decision was supported by substantial evidence, it had affirmed the board's decision to deny the College's application for accreditation. The appeal panel also found that the board's decision was not inconsistent with its previous accreditation decisions cited by the College because the other successful schools had not been as deficient as the College.

On at least three occasions during the pendency of its application for accreditation, the College suggested to the Foundation that it was considering taking legal action against the Foundation. In a letter to the Foundation concerning the Foundation's second on-site evaluation, sent on July 31, 1996, the College's attorney wrote: "While we prefer to resolve this matter privately and confidentially, should [the Foundation] decline to award earned accreditation, the College will consider all of its options, including the filing of a lawsuit ... ." In another letter sent to the Foundation on

Consequently, courts are not free to conduct a *de novo* review or to substitute their judgment for the professional judgment of the educators involved in the accreditation process.

*Wilfred Acad. of Hair & Beauty Culture v. Southern Ass'n of Coll. & Schs.*, 957 F.2d 210, 214 (5th Cir. 1992).

Even without this "great deference" due plaintiff arising out of its professional judgment, the record fully supports the decision of Judge Merritt and affirming the district court.

---

### CONCURRENCE

---

HARRY W. WELLFORD, Circuit Judge, concurring. Judge Merritt's excellent discussion of the issues in this controversy leaves little requirement for any extended discourse. I write concerning the jurisdictional issue, and I fully concur in the conclusion that "the district court properly exercised its discretion in allowing the Foundation to bring its declaratory judgment claim." I do not find the Foundation's decision to bring this action in the Western District of Michigan promptly after issuing its final decision to be troubling. Counsel for the College had repeatedly warned of legal action, and the nature of the Foundation's structure and operations behooved it to pursue a legal disposition of its rights in a "home" court rather than in some distant forum. The College had every opportunity to challenge jurisdiction and venue if it chose to do so.

I would emphasize also that:

In reviewing an accrediting association's decision to withdraw a member's accreditation, the courts have accorded the association's determination great deference. *Medical Inst. of Minnesota*, 817 F.2d at 1314; *Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Sch.*, 432 F.2d 650, 657 (D.C. Cir.), *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970). Courts give accrediting associations such deference because of the professional judgment these associations must necessarily employ in making accreditation decisions. In considering the substance of accrediting agencies' rules, courts have recognized that "[t]he standards of accreditation are not guides for the layman but for professionals in the field of education." *Parsons College v. North Cent. Ass'n of College and Secondary Sch.*, 271 F.Supp. 65, 73 (N.D. Ill. 1967).

September 16, 1996, in the midst of discussions about the second on-site visit, the College's attorney suggested that, if discussions broke off, "the College [would] explore the numerous options available." Finally, on February 9, 1998, less than two months before the College's second appeal of the Foundation's decision to deny it accreditation, the College's attorney informed the Foundation that, if the Foundation did not grant accreditation upon appeal, "the College will have no choice but to pursue its claims against [the Foundation], and expose its disparate practices to a public whose trust in [the Foundation's] ability to objectively evaluate applicant programs is clearly misplaced."

Anticipating legal action by the College, the Foundation filed a complaint on April 22, 1998, seeking a declaratory judgment that its decision to deny the College's accreditation application was lawful. This complaint was filed ten minutes after the Foundation transmitted to the College its decision to affirm its second denial of the College's application for accreditation. The College subsequently filed counterclaims against the Foundation alleging breach of contract, violation of common law due process, breach of fiduciary duty, antitrust violations, and fraud. On December 21, 1998, the district court granted the Foundation's motion for summary judgment on its declaratory judgment claim. On September 3, 1999, the district court granted the Foundation's motion to dismiss each of the College's counterclaims for failure to state a claim.

### II. Jurisdiction over the Foundation's declaratory judgment claim

As an initial matter, the College argues that the district court did not have subject matter jurisdiction over the Foundation's claim for declaratory judgment because the claim did not present a justiciable controversy. Federal courts are empowered to entertain declaratory judgment actions only when a party alleges facts that "show that there is a substantial controversy, between parties having adverse

legal interests, of sufficient immediacy and reality ... .” *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844-45 (6th Cir. 1994).

Even if the district court did not initially have jurisdiction to hear the Foundation's declaratory action -- a question we need not, and do not, decide -- the College conferred jurisdiction by filing its counterclaims. *See Gopher Oil Co. v. Bunker*, 84 F.3d 1047, 1050-51 (8th Cir. 1996). In *Gopher Oil*, a case the district court relied upon, the Environmental Protection Agency threatened to sue Gopher Oil for cleanup costs. Gopher Oil brought a declaratory judgment claim against the representative of the previous owners of the property alleging that they would be liable for the cleanup costs if Gopher Oil was in fact sued by the government. The Eighth Circuit found that, while the plaintiff's declaratory judgment claim may not have been ripe when filed, it had ripened by the time of appeal because the government had in fact brought its claim. *See id.* at 1051.

While *Gopher Oil* did not involve compulsory counterclaims, it stands for the proposition that a federal court can, in certain circumstances, acquire subject matter jurisdiction over a declaratory judgment claim that was arguably unripe when filed. This case presents such a circumstance. We note that a defendant can move to dismiss a declaratory judgment claim for lack of jurisdiction before filing its compulsory counterclaims. We find that the district court had jurisdiction to decide this case and that we have jurisdiction to review the court's decision.

Where a federal court has jurisdiction to hear a declaratory judgment claim, the power to do so is discretionary, and the court may refuse to hear such a claim on equitable grounds. *See Green v. Mansour*, 474 U.S. 64, 72-73 (1985); *Nationwide Mut. Fire Ins. Co. v. Willenbrink*, 924 F.2d 104, 105 (6th Cir. 1991). This court reviews a district court's

## VI. Conclusion

For the foregoing reasons, we affirm the district court's decision granting the Foundation's motion for summary judgment on its claim for declaratory judgment, and the court's decision granting the Foundation's motion to dismiss the College's counterclaims.

n.13 (1978) (citing *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969); *id.*, at 341 (Marshall, J., dissenting)); *Stratmore*, 866 F.2d at 192; *Continental Cablevision of Ohio, Inc.*, 715 F.2d at 1118. None of these cases, however, stand for the proposition that an antitrust plaintiff in a rule of reason case does not need to plead and to prove antitrust injury. Even if an allegation of unlawful purpose could sustain an antitrust claim, however, the College has made only speculative and conclusory allegations that the Foundation acted with an unlawful purpose. Because the College did not allege that the Foundation has market power in the relevant market, and because the College did not allege that it has suffered an antitrust injury, we find that the district court was correct to dismiss the College's antitrust claims.

## V. The College's common law claims

Finally, the College argues that the district court erred in dismissing its common law claims for breach of contract, breach of fiduciary duty, violation of common law procedural and substantive due process, and fraud. We agree with the district court that these claims arise from the Foundation's decision to deny the College's accreditation application. We therefore review the Foundation's decision as an accreditation decision, not as a contract, fiduciary duty, fraud or other common law claim. *See Chicago Sch. of Automotive Transmissions, Inc.*, 44 F.3d at 448-49; *Dietz*, 479 F.Supp. at 559-60; *Transport Careers, Inc.*, 646 F.Supp. at 1480-81. As discussed *supra*, our review of the Foundation's accreditation decision is limited to alleged procedural violations; it does not extend to the substance of the accreditation decision. *See Dietz*, 479 F.Supp. at 559. We have found *supra* that the Foundation did not act in an arbitrary or unreasonable manner in denying the College's accreditation application and that its decision was based on substantial evidence. The College can not prevail on its common law claims as a matter of law. We find that the district court did not err in dismissing these claims.

exercise of discretion to hear a declaratory judgment claim for abuse of discretion with these factors in mind:

1) whether the judgment would settle the controversy; 2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; 3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" 4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and 5) whether there is an alternative remedy that is better or more effective.

*Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 967-68 (6th Cir. 2000) (quoting *Omaha Prop. & Cas. Ins. Co. v. Johnson*, 923 F.2d 446, 447-48 (6th Cir. 1991)).

Consideration of most of these factors supports the district court's decision to hear the Foundation's claim. This case does not raise any significant concerns about friction between state and federal courts. The record does not indicate that there is a preferable alternate remedy. The district court's declaratory judgment did help clarify the legal relations of the parties and settle the parties' controversy.

The College contends, however, that the Foundation used its declaratory judgment claim merely to achieve a procedural advantage. This is a legitimate concern. The fact that the Foundation's complaint was filed immediately after the Foundation transmitted its final denial of accreditation is troubling, especially because the Foundation apparently made its accreditation decision one month before it informed the College. The timing of the Foundation's action creates a strong inference that it acted with some strategic purpose. The College has not, however, argued that it has suffered any concrete disadvantage by the Foundation's action. Furthermore, the College did file its numerous counterclaims before arguing that the district court should not to hear the

Foundation's claim. We find, therefore, that the district court properly exercised its discretion in allowing the Foundation to bring its declaratory judgment claim.

### III. The Foundation's accreditation decision

The College appeals the district court's decision granting the Foundation's motion for summary judgment on its claim for declaratory judgment. Michigan law controls the Foundation's claim. Unfortunately, there are no Michigan cases directly on point. There is, however, a body of jurisprudence concerning academic accreditation in decisions from other jurisdictions. *See, e.g.*, *Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Sch. & Colls.*, 44 F.3d 447 (7th Cir. 1994); *Wilfred Acad. of Hair & Beauty Culture v. Southern Ass'n of Colls. & Sch.*, 957 F.2d 210 (5th Cir. 1992); *Medical Inst. of Minnesota v. National Ass'n of Trade & Technical Sch.*, 817 F.2d 1310 (8th Cir. 1987); *Marlboro Corp. v. Association of Indep. Colls. & Sch., Inc.*, 556 F.2d 78 (1st Cir. 1977); *Marjorie Webster Junior Coll., Inc. v. Middle States Assoc. of Colls. & Secondary Sch., Inc.*, 432 F.2d 650 (D.C. Cir. 1970); *North Dakota v. North Cent. Ass'n of Colls. & Secondary Sch.*, 99 F.2d 697 (7th Cir. 1938); *Philadelphia Wireless Technical Inst. v. Accrediting Comm'n of Career Sch. & Colls. of Tech.*, No. CIV. A. 98-2843, 1998 WL 744101 (E.D. Pa. Oct. 23, 1998); *Rockland Inst. v. Association of Indep. Colls. & Sch.*, 412 F.Supp. 1015 (C.D. Cal. 1976); *Parsons Coll. v. North Cent. Assoc. of Colls. & Secondary Sch.*, 271 F.Supp. 65 (N.D. Ill. 1967); *Blende v. Maricopa County Med. Soc'y*, 393 P.2d 926 (Ariz. 1964); *Falcone v. Middlesex County Med. Soc'y*, 170 A.2d 791 (N.J. 1961).

This jurisprudence derives from early common law relating to private, voluntary organizations. *See Falcone*, 170 A.2d at 795-800; *Blende*, 393 P.2d at 929 (noting "the traditional view that medical societies and other voluntary associations have unlimited discretion to grant or refuse admission to membership"). Despite the traditional reluctance of courts to

its accreditation decisions on anticompetitive standards, including target faculty salaries and limitations on the transfer of credits from nonaccredited law schools. Massachusetts School of Law experienced a 40% drop in enrollment after being denied accreditation. The School claimed that the Association's anticompetitive conduct caused the school to suffer an antitrust injury because 1) its students were not allowed to sit for state bar exams; 2) the school suffered stigma due to the denial of accreditation; 3) the Association's standards increased the cost of faculty salaries, directly or indirectly, through marketplace inflation; and 4) the limitation on transferring credits constituted a boycott. Affirming a grant of summary judgment against the school, the *Massachusetts School of Law* court found 1) that stigma -- i.e., loss of prestige – is not an antitrust injury; 2) that the decision of states bar associations not to admit students from nonaccredited schools was protected government action; 3) that the effect of accreditation standards on price was either nonexistent or indirect; and 4) that the school had not provided any evidence that it had been injured by the limitations on transfer credits. Here, the College has not alleged that the Foundation has conducted any activities more potentially damaging to competition than the activities of the defendants in *Massachusetts School of Law*, *Zavaletta*, and *Brandt*. Similarly, the College has not alleged that it suffered any greater, or any different, injury than the injuries suffered by the plaintiffs in those cases.

As a final matter, the College argues that an allegation of unlawful purpose can independently sustain a claim under Section 1 of the Sherman Act. The College relies on such cases as *Stratmore v. Goodbody*, 866 F.2d 189, 191-92 (6th Cir. 1989); *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 809 (6th Cir. 1988); and *Continental Cablevision of Ohio, Inc. v. American Elec. Power Co.*, 715 F.2d 1115, 1118 (6th Cir. 1983). These cases refer in passing to "the general rule that a civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436

*Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992); *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999); *see also Crounse Corp. v. ICC*, 781 F.2d 1176, 1188 (6th Cir. 1986). Here, however, definition of the relevant market requires relatively little factual analysis. Based on a review of the record, we find that the College competes with schools that have non-accredited interior design programs and with schools that have accredited programs. Thus, the relevant market in this case includes all interior design programs. We find that the College did not provide a sufficient factual predicate to support its allegations that the Foundation enjoys market power in the market of all interior design programs.

### C. Injury

Alternatively, the College also appeals the district court's decision that, as a matter of law, the College did not suffer an antitrust injury. Professional associations are generally capable of violating antitrust laws and causing antitrust injuries. *See Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (citing *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990); and *American Soc'y of Mechanical Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1982)). We have not found a case, however, in which a denial of school accreditation gave rise to a successful allegation of antitrust injury. At most, courts in other jurisdictions have found that a denial of school accreditation results in a loss of reputation or a drop in school enrollment, neither of which constitute antitrust injuries. *See Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 107 F.3d 1026, 1038 (3d Cir. 1997); *see also Zavaletta v. American Bar Ass'n*, 721 F.Supp. 96 (E.D. Va. 1989); *Brandt v. American Bar Ass'n*, No. CIV. A. 3:96-cv-2606D, 1997 WL 279762 (N.D. Tex. May 15, 1997). *Massachusetts School of Law*, *Zavaletta*, and *Brandt* involved allegations of antitrust violations stemming from the denial of law school accreditation. The plaintiff in *Massachusetts School of Law*, for example, argued that the American Bar Association based

review such membership decisions, the Seventh Circuit indicated as early as 1938 that it would interfere with an accrediting association's decision to rescind a school's accreditation if the decision was "arrived at arbitrarily and without sufficient evidence to support [it]." *North Dakota*, 99 F.2d at 700; *see also Parsons Coll.*, 271 F.Supp. at 71-74 (characterizing this standard as a matter of common law due process). *Falcone* and *Blende*, two influential state court cases on physician licensing from the 1960's, articulated a similar rule for professional associations. These cases reasoned that, because the medical societies in question exercised a monopolistic power in areas of public concern, they were required to base their decisions on substantial evidence and were not allowed to act arbitrarily or unreasonably. *See Falcone*, 170 A.2d at 795-800; *Blende*, 393 P.2d at 930.

In a landmark case, the Court of Appeals for the District of Columbia refined and generalized the rule from *Falcone* and *Blende*, finding that, where membership in an organization is a significant requirement to practice in a given profession, courts will scrutinize the standards and procedures used by the organization to select its membership. *See Marjorie Webster*, 432 F.2d at 655-56. Reviewing a decision by the Middle States Association of Colleges and Secondary Schools to deny accreditation to Marjorie Webster Junior College, however, the D.C. Circuit found that the denial did not greatly hinder the school's ability to continue to operate successfully and that it did not warrant heightened scrutiny. *Id.* at 656. The court found that "judicial review of [Middle States]'s standards should accord substantial deference to [Middle State]'s judgment regarding the ends that it serves and the means most appropriate to those ends." *Id.* at 657. In subsequent cases reviewing school accreditation decisions, courts have held that such decisions are accorded "great deference" and have "consistently limited their review ... to whether the decisions were 'arbitrary and unreasonable' and whether they were supported by 'substantial evidence.'" *Wilfred Acad. of Hair & Beauty Culture*, 957 F.2d at 214

(citing *Medical Inst. of Minnesota*, 817 F.2d at 1314; *Marjorie Webster Junior Coll., Inc.*, 432 F.2d at 657; *Rockland Inst.*, 412 F.Supp. at 1016; *Parsons Coll.*, 271 F.Supp at 73); *see also*, *Chicago Sch. of Automatic Transmissions, Inc*, 44 F.3d at 449-50; *Transport Careers, Inc.*, 646 F.Supp. at 1480-81. Courts have refused to conduct *de novo* accreditation reviews, *see Rockland Inst.*, 412 F.Supp at 1018-19, and they have refused to consider claims of disparate treatment of accreditation applicants, *see Transport Careers*, 646 F.Supp. at 1485-86; *Marlboro Corp.*, 556 F.2d at 80 n.2.

In 1992, Congress provided that federal courts have exclusive jurisdiction over suits brought by schools challenging accreditation decisions made by certain organizations approved by the Secretary of Education. *See* 20 U.S.C. § 1099b(f); *see also Chicago Sch. of Automatic Transmissions, Inc.*, 44 F.3d at 449. This statute does not apply in this case because the Foundation was not at any relevant time approved by the Secretary of Education. In *Chicago School*, a case decided under this statute, the Seventh Circuit determined that the common law standard for reviewing accreditation decisions is essentially the same as the standard used to review decisions by administrative agencies -- i.e., "whether the ... decision was 'arbitrary, capricious, an abuse of discretion, ...' or reached 'without observance of procedure required by law.'" *Chicago Sch. of Automatic Transmissions, Inc.*, 44 F.3d at 449-50 (quoting 5 U.S.C. § 706(2)(A), (D)).

The parties and the district court have taken notice of two cases, *Maitland v. Wayne State Univ. Med. Sch.*, 257 N.W.2d 195 (Mich. Ct. App. 1977); and *Dietz v. American Dental Ass'n*, 479 F.Supp. 554 (E.D. Mich. 1979) (Kennedy, J.), that strongly suggest that Michigan courts would adopt the common law standard of review for school accreditation decisions discussed above. *Maitland* involved a suit by a medical student seeking to be reinstated in good standing at his school. The Michigan court reviewed the defendant's

whether or not the Foundation's accreditation decision is trade or commerce pursuant to the Sherman Act.

## B.  Market power

The College appeals the district court's decision that it did not sufficiently allege that the Foundation enjoys market power in the relevant market. Generally, a plaintiff must show that his defendant has market power in the relevant market to prove an antitrust injury. *See Lie*, 964 F.2d at 569-70. Furthermore, "[t]o establish a claim under section 1, the plaintiff must establish that [a] ... combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets ... ." *Davis-Watkins Co. v. Service Merch.*, 686 F.2d 1190, 1195-96 (6th Cir. 1982). The relevant market for this purpose "is composed of products that have reasonable interchangeability for the purposes for which they are produced ... ." *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 404 (1956); *American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.*,185 F.3d 606, 622 (6th Cir. 1999) ("The relevant market includes those products or services that are reasonably interchangeable with, as well as identical to, defendant's product.").

The College alleged in its counterclaim complaint that the Foundation abused its market power in the "market for accredited interior design programs" by restricting output and suppressing competition. The district court rejected the College's market definition, finding that non-accredited programs for the study of interior design are interchangeable with accredited programs, and that the proper market definition includes all interior design programs. The district court then found that the College did not allege that the Foundation enjoyed substantial market power in the market of all interior design programs.

Market definition is a highly fact-based analysis that generally requires discovery. *See Eastman Kodak Co. v.*

dismissal of the complaint on a defendant's 12(b)(6) motion. *See Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988). While the pleading standard under the federal rules is very liberal, *see* Fed. R. Civ. P. 8, "the price of entry, even to discovery, is for the plaintiff to allege a factual predicate concrete enough to warrant further proceedings, which may be costly and burdensome." *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) (emphasis omitted).

### A. Trade or commerce

As a threshold question, the district court considered whether or not the Foundation's activities represent "trade or commerce," for the purpose of antitrust analysis. It noted that, in *Marjorie Webster*, discussed *supra*, the D.C. Circuit held that, unless an accreditation decision was based on commercial motives, "accreditation is an activity distinct from the sphere of commerce." *Marjorie Webster Junior Coll., Inc. v. Middle States Assoc. of Colls. & Secondary Sch., Inc.*, 432 F.2d 650, 654-55 (D.C. Cir. 1970); *see also United States v. Brown Univ.*, 5 F.3d 658, 667-68 (3d Cir. 1993) (discussing *Marjorie Webster*, but finding that tuition is a commercial transaction). After the Supreme Court's decision in *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), however, the status of this holding in *Marjorie Webster* is questionable. In *Goldfarb*, the Court dismissed the argument that there was an antitrust exception for the "learned professions." *Id.* at 786-88. The Court read the scope of Section 1 of the Sherman Act very broadly and found that there is no public-service exemption from the antitrust laws. *Id.* The Foundation's accreditation decision may fall within the scope of commerce described in *Goldfarb*. In this case, however, the district court did not discuss *Goldfarb*, finding instead that the College successfully alleged that the Foundation had a commercial motive in reaching its accreditation decision. The parties do not challenge the court's determination, so we do not reach the question of

actions for arbitrariness, capriciousness, and denial of procedural due process -- a standard very similar to the school accreditation cases. *Maitland*, 257 N.W.2d at 637-38. *Dietz* involved a challenge by an individual denied membership in a medical association. There, citing *Marjorie Webster*, the court found that it should not afford great deference to membership decisions by professional organizations that exercise monopoly power in their professions. *Dietz*, 479 F.Supp. at 557. The court found that, in such cases, "the association has a fiduciary duty to be substantively rational and procedurally fair." *Id.* The *Dietz* court applied this standard and found that there were disputed issues of fact requiring discovery -- e.g., whether or not the plaintiff had been given the standard amount of time to take an exam and whether or not the reviewing members of the association had made comments about the plaintiff's appearance. *Id.* at 559. The court specifically found, however, that it would not review the plaintiff's qualifications for membership. *Id.* ( "This court may only determine whether the procedure was fair and whether arbitrary factors were used to determine the result. If the result was not based on arbitrary factors, but on substantive factors within the [defendant's] competence, this court cannot substitute its judgment for theirs.").

The district court therefore applied the correct standard in reviewing the Foundation's accreditation decision. The College argues that, even under the deferential standard of review adopted by the district court, it is entitled to prevail because the Foundation's decision was arbitrary and/or discriminatory. In making this claim, the College relies on the comments made by members of the Foundation accreditation committee who disagreed with the first visiting team's report. Such comments, however, are reasonably understood as part of a procedurally fair deliberative process. The College also contends that the Foundation's decision to conduct a second on-site evaluation represents a significant deviation from the Foundation's own procedural rules and that it provides evidence of arbitrariness or discrimination. If the second visit was a deviation, however, it was one that

provided the College additional procedural safeguards; it made the Foundation's accreditation decision-making process more fair, not less.

Finally, the College claims that the Foundation has awarded accreditation to a number of schools with qualifications similar to those of the College. According to the College, this is evidence that the Foundation treated the College disparately and/or that it discriminated against the College. Because the record does not provide any credible indication that the Foundation had acted in an arbitrary or unreasonable manner in denying the College's accreditation application, and because the record indicates that the Foundation's accreditation decision was based on substantial evidence, the district court was correct in deciding not to give consideration to the relative qualifications of other schools accredited by the Foundation. We find that the court did not err in granting the Foundation's motion for summary judgment on its declaratory judgment claim.

## IV.  The College's antitrust claims

The College also appeals the district court's dismissal of its federal and state antitrust claims. The district court found that the College did not properly allege that the Foundation has substantial market power in the relevant market. It also found that the College did not allege that the Foundation injured competition through its accreditation activities. The court determined that, even with the opportunity for additional discovery, the College would not be able to state a claim for antitrust violations. We review the district court's dismissal *de novo*. *See Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997).

The Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states ... is hereby

declared to be illegal." 15 U.S.C. § 1.[1] Despite the broad language of the statute, it has been held to prohibit only unreasonable restraints of commerce or trade. "[A]greements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958); *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985). Here, although the College alleged a group boycott by the Foundation and its members, the action giving rise to the College's complaint does not constitute a *per se* violation. As the district court noted, accreditation serves an important public purpose and can enhance competition. *See Lie v. St. Joseph Hosp. of Mount Clemens*, 964 F.2d 567, 570 (6th Cir. 1992) (finding that a peer review process for doctors has a public purpose and can enhance competition). Because the Foundation's activity is not a *per se* antitrust violation, we analyze it according to a rule of reason, which requires the College to allege and to prove that the Foundation's action "may suppress or even destroy competition." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986); *Lie*, 964 F.2d at 569-70. The College must prove more than its own damages, *see Lie*, 964 F.2d at 570, because the antitrust laws are designed for "the protection of competition, not competitors," *see Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent

---

[1]The same analysis applies to the College's federal and state antitrust claims.