**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 14-1086**

---

PROFESSIONAL MASSAGE TRAINING CENTER, INCORPORATED, a
Missouri Corporation,

    Plaintiff - Appellee,

        v.

ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES, d/b/a
Accrediting Commission of Career Schools and Colleges, a
Virginia Corporation,

    Defendant - Appellant.

-------------------------

ACCREDITATION REVIEW COMMISSION ON EDUCATION FOR THE
PHYSICIAN ASSISTANT; ACCREDITATION COMMISSION FOR
ACUPUNCTURE AND ORIENTAL MEDICINE; ACCREDITATION COUNCIL FOR
PHARMACY EDUCATION; ACCREDITING BUREAU OF HEALTH EDUCATION
SCHOOLS, INCORPORATED; ACCREDITING COMMISSION FOR COMMUNITY
AND JUNIOR COLLEGES, WESTERN ASSOCIATION OF SCHOOLS AND
COLLEGES; ACCREDITING COUNCIL FOR CONTINUING EDUCATION &
TRAINING; ACCREDITING COUNCIL FOR INDEPENDENT SCHOOLS AND
COLLEGES; AMERICAN COUNCIL ON EDUCATION; ASSOCIATION OF
SPECIALIZED AND PROFESSIONAL ACCREDITORS; ASSOCIATION OF
TECHNOLOGY, MANAGEMENT, AND APPLIED ENGINEERING; COMMISSION
ON INSTITUTIONS OF HIGHER EDUCATION OF THE NEW ENGLAND
ASSOCIATION OF SCHOOLS AND COLLEGES; COUNCIL FOR
ACCREDITATION OF COUNSELING AND RELATED EDUCATIONAL
PROGRAMS; COUNCIL FOR HIGHER EDUCATION ACCREDITATION;
COUNCIL FOR PODIATRIC MEDICATION EDUCATION; COUNCIL ON
EDUCATION FOR PUBLIC HEALTH; COUNCIL ON OCCUPATIONAL
EDUCATION; DISTANCE EDUCATION AND TRAINING COUNCIL; MIDDLE
STATES COMMISSION ON HIGHER EDUCATION, THE; NATIONAL
ARCHITECTURAL ACCREDITING BOARD; SOUTHERN ASSOCIATION OF
COLLEGES AND SCHOOLS COMMISSION ON COLLEGES; WESTERN

ASSOCIATION OF SCHOOLS AND COLLEGES SENIOR COLLEGE COMMISSION; HIGHER LEARNING COMMISSION,

Amici Supporting Appellant,

AMERICAN COUNCIL OF TRUSTEES AND ALUMNI; THE JOHN WILLIAM POPE CENTER FOR HIGHER EDUCATION POLICY; JUDICIAL EDUCATION PROJECT,

Amici Supporting Appellee.

---

**No. 14-1136**

---

PROFESSIONAL MASSAGE TRAINING CENTER, INCORPORATED, a Missouri Corporation,

Plaintiff - Appellant,

v.

ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES, d/b/a Accrediting Commission of Career Schools and Colleges, a Virginia Corporation,

Defendant - Appellee.

------------------------

ASSOCIATION OF SPECIALIZED AND PROFESSIONAL ACCREDITORS; ACCREDITING BUREAU OF HEALTH EDUCATION SCHOOLS, INCORPORATED; ACCREDITING COUNCIL FOR CONTINUING EDUCATION & TRAINING; ACCREDITING COUNCIL FOR INDEPENDENT SCHOOLS AND COLLEGES; COUNCIL ON OCCUPATIONAL EDUCATION; DISTANCE EDUCATION AND TRAINING COUNCIL; COUNCIL FOR HIGHER EDUCATION ACCREDITATION; ACCREDITING COMMISSION FOR COMMUNITY AND JUNIOR COLLEGES, WESTERN ASSOCIATION OF SCHOOLS AND COLLEGES; ACCREDITATION COUNCIL FOR PHARMACY EDUCATION; ASSOCIATION OF TECHNOLOGY, MANAGEMENT, AND APPLIED ENGINEERING; COUNCIL ON EDUCATION FOR PUBLIC HEALTH; COUNCIL FOR PODIATRIC MEDICATION EDUCATION; MIDDLE STATES COMMISSION ON HIGHER EDUCATION, THE; NATIONAL ARCHITECTURAL ACCREDITING BOARD; COMMISSION ON INSTITUTIONS OF HIGHER EDUCATION OF THE NEW ENGLAND ASSOCIATION OF SCHOOLS AND COLLEGES; SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS COMMISSION ON COLLEGES;

AMERICAN COUNCIL ON EDUCATION; ACCREDITATION REVIEW COMMISSION ON EDUCATION FOR THE PHYSICIAN ASSISTANT; COUNCIL FOR ACCREDITATION OF COUNSELING AND RELATED EDUCATIONAL PROGRAMS; WESTERN ASSOCIATION OF SCHOOLS AND COLLEGES SENIOR COLLEGE COMMISSION; ACCREDITATION COMMISSION FOR ACUPUNCTURE AND ORIENTAL MEDICINE,

Amici Supporting Appellee,

AMERICAN COUNCIL OF TRUSTEES AND ALUMNI; THE JOHN WILLIAM POPE CENTER FOR HIGHER EDUCATION POLICY; JUDICIAL EDUCATION PROJECT,

Amici Supporting Appellant.

———————————————

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria.  Liam O'Grady, District Judge.  (1:12-cv-00911-LO-IDD)

———————————————

Argued: January 28, 2015                    Decided: March 24, 2015

———————————————

Before WILKINSON, AGEE, and HARRIS, Circuit Judges.

———————————————

Affirmed in part, reversed in part, and remanded with instructions by published opinion.  Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Harris joined.

———————————————

**ARGUED:** Craig C. Martin, Michael Anthony Scodro, JENNER & BLOCK, LLP, Chicago, Illinois, for Appellant/Cross-Appellee.  Matthew Lorn Hoppock, DUNN & DAVISON LLC, Kansas City, Missouri, for Appellee/Cross-Appellant.  **ON BRIEF:** Sarah A. Palmer, JENNER & BLOCK, LLP, Chicago, Illinois, for Appellant/Cross-Appellee.  Ronald L. Holt, Julie G. Gibson, DUNN & DAVISON LLC, Kansas City, Missouri, for Appellee/Cross-Appellant.  Mary E. Kohart, Dean R. Phillips, Gregory S. Voshell, Michelle L. Modery, ELLIOTT GREENLEAF & SIEDZIKOWSKI, P.C., Blue Bell, Pennsylvania; Kenneth J. Ingram, Thomas Mugavero, WHITEFORD TAYLOR PRESTON, LLP, Washington, D.C.; Ada Meloy, AMERICAN COUNCIL ON EDUCATION, Washington, D.C., for Amici Accreditation Review Commission on Education for the Physician Assistant, Accreditation Commission for Acupuncture and Oriental Medicine, Accreditation Council for

3

Pharmacy Education, Accrediting Bureau of Health Education Schools, Incorporated, Accrediting Commission for Community and Junior Colleges-Western Association of Schools and Colleges, Accrediting Council for Continuing Education & Training, Accrediting Council for Independent Schools and Colleges, American Council on Education, Association of Specialized and Professional Accreditors, Association of Technology, Management, and Applied Engineering, Commission on Institutions of Higher Education of the New England Association of Schools and Colleges, Council for Accreditation of Counseling and Related Educational Programs, Council for Higher Education Accreditation, Council for Podiatric Medication Education, Council on Education for Public Health, Council on Occupational Education, Distance Education and Training Council, Higher Learning Commission, The Middle States Commission on Higher Education, National Architectural Accrediting Board, Southern Association of Colleges and Schools Commission on Colleges, and Western Association of Schools and Colleges Senior College Commission. Shannen W. Coffin, Jeffrey M. Theodore, STEPTOE & JOHNSON LLP, Washington, D.C., for Amici American Council of Trustees and Alumni, Judicial Education Project, and The John William Pope Center for Higher Education Policy.

---

4

WILKINSON, Circuit Judge:

The Professional Massage Training Center (PMTC) brought this suit against the Accreditation Alliance of Career Schools and Colleges (ACCSC or the Commission) for violation of its due process rights after ACCSC denied the school's application for re-accreditation in 2010. Following a four-day bench trial, the district court awarded PMTC more than $400,000 in damages and reinstated the school's accreditation.

The proper standard of review of actions by private accrediting agencies considers only whether the accreditation decision was supported by substantial evidence or otherwise arbitrary and capricious. What the district court conducted here amounted to a de novo approach to the accreditation process that resulted in a wholesale substitution of the judgment of the court for that of the agency. Judged by the correct standard of review, the accreditation decision here was well supported, not arbitrary or capricious, and we thus reverse the judgment of the district court in that regard. We affirm, however, its dismissal of PMTC's state law claims for breach of contract, negligence, and tortious interference. We remand to the district court with directions to enter judgment in favor of ACCSC on PMTC's due process claim and to dismiss the case.

I.

ACCSC is a non-profit, non-stock corporation established in Virginia that accredits private schools of higher education offering career-oriented programs. It is recognized by the Secretary of Education as an accrediting agency, see 20 U.S.C. § 1099b, and it accredits nearly 750 institutions nationwide. Accreditation, among other things, entitles educational institutions to access Title IV federal student aid funding. See 20 U.S.C. §§ 1070 et seq. PMTC is a single-discipline massage therapy training school in Springfield, MO. It has been owned and operated by Juliet Mee since 1994. ACCSC first accredited the school in 2000 and renewed its accreditation in 2005. The case at bar arose from PMTC's application for renewal of accreditation in 2010.

ACCSC has set Standards of Accreditation that define both the process for schools to seek or renew accreditation as well as the substantive criteria schools must meet to be accredited. See J.A. 4729-4858. ACCSC's accreditation process begins when a school sends a full-time on-site management representative to an informational accreditation workshop, id. at 4747, which PMTC did in December of 2009, id. at 1448. The school then submits an application and a self-evaluation report. Id. at 4747-48. The application is followed by an on-site evaluation, led by a team

6

from ACCSC, which then provides to the school a Team Summary Report.

The Team Summary Report is a factual report and summary of the team's compliance findings, and does not include any final recommendation for the Commission's action on accreditation. Id. at 4752. A team from ACCSC visited PMTC on August 9-10, 2010. The team was led by Michael Ackerman, the Director of ATI Enterprises, which operates for-profit career schools. Id. at 1455. The team also included other education and massage therapy professionals and ACCSC staffers Courtney Kiesel Moraites and Lisa Miles. Moraites, supervised by Miles, wrote the subsequent Team Summary Report issued on September 23, 2010. Id. The report detailed a number of areas of concern, including problems with management capability and retention of administrative staff, failures in strategic planning, lack of ongoing faculty assessment and professional development, failure to demonstrate adequate student achievement and employment rates, failure to comply with federal financial requirements, as well as deficiencies in the learning resource system and processes for verification of faculty credentials. See id. at 1460-64.

Pursuant to the ACCSC Standards, PMTC had 30 days to submit additional material in response to the report. It did so following a brief deadline extension, at which point the entire record was reviewed by a preliminary school action panel of

7

three Commissioners, and then by the full Commission. See id. at 435-37. Within ACCSC, the Commission is composed of four public Commissioners and nine private Commissioners. Id. at 4848. Public Commissioners are those "[p]ersons with an interest and expertise in employment, education and training" who are not connected to an institution accredited by ACCSC. Id. Private, or School, Commissioners are "[p]roprietors or bona fide executives" of institutions accredited by ACCSC. Id. In December 2010, the Commission issued a Probation Order listing eleven areas in which PMTC had failed to establish compliance, and gave PMTC until March 2011 to respond and demonstrate improvements in areas of concern. Id. at 1781-91. PMTC submitted a response including documentation in March of 2011, seven days after the March 8 deadline. Id. at 1792-1867.

In June 2011, the Commission notified PMTC that it had vacated the Probation Order, "defer[ing] final action on the school's Application for Renewal of Accreditation until the November 2011 meeting in order to provide PMTC with an additional opportunity to demonstrate compliance." Id. at 1868. ACCSC conducted a second on-site visit to focus on PMTC's Institutional Assessment and Improvement Plan (IAIP), specifically with regard to management issues, the learning resource system, faculty qualification verification, and financial stability. See id. at 1868-73.

8

The second on-site team was led by Mollie Hager and ACCSC staff member Lisa Miles. Id. at 1874. Miles wrote the Team Summary Report, which identified five areas in which PMTC was still failing to meet ACCSC Standards, specifically including management, learning resources, and faculty qualification verification. Id. at 1878-99. PMTC submitted a number of documents in response, and notably provided Miles with two binders full of documents as part of the on-site visit, which Miles took to her home and did not share directly with the Commission. In December 2011, following PMTC's submission, the Commission issued a second Probation Order instructing PMTC to provide evidence of compliance with accrediting standards on management continuity and capacity, institutional assessment and improvement activities, the learning resource system, and faculty qualifications and verification. Id. at 2156-67. PMTC submitted its response in January 2012. Id. at 2169-2373.

In February 2012, a school action panel met and recommended that ACCSC not renew PMTC's accreditation. The panel expressed concern with PMTC's continued compliance failures, especially relating to management turnover. Id. at 855, 858-60. The full Commission voted 12-0 not to renew accreditation on the grounds that PMTC had failed to demonstrate "continuity of management and administrative capacity," id. at 2377, had failed to bring the learning resource system into compliance with accrediting

9

standards, and had failed to demonstrate compliance with standards on faculty qualifications and verification, id. at 2374-84. On April 5, 2012, PMTC appealed the denial decision to an independent ACCSC appeals panel, which affirmed the Commission's denial. Id. at 2574-92. The denial decision became final on July 11, 2012 and the Department of Education began withholding Title IV funds on July 27, 2012. Id. at 2574, 4030.

On August 16, 2012, PMTC filed a six-count complaint against ACCSC in the Eastern District of Virginia, sounding in common law due process, breach of contract, negligence and tortious interference with various business and contractual relations. The district court granted a preliminary injunction requiring ACCSC to reinstate PMTC's accreditation. In its Amended Complaint, PMTC added allegations of bias by ACCSC's staff against PMTC.

After a four-day bench trial, the court entered judgment in favor of PMTC, finding that ACCSC had violated the school's due process rights. It awarded the school $429,016.62 in damages, and ordered ACCSC to fully reinstate its accreditation, but dismissed the remaining state law claims. The court found that ACCSC's Standards were not clearly defined and did not provide guidance and metrics for schools to ascertain how to meet the Standards. In addition, it found the agency had violated PMTC's due process rights by denying accreditation in a manner that was

10

arbitrary and unreasonable. It reasoned that Juliet Mee, PMTC's owner and director, provided sufficient continuity of management to meet ACCSC's performance Standards and that bias had impermissibly influenced the agency's denial of accreditation. ACCSC appealed the finding that PMTC was denied due process of law and PMTC cross-appealed the dismissal of its state law claims for breach of contract, negligence, and tortious interference.

## II.

ACCSC contends that the district court erred in not according sufficient, if any, deference to the decision of the accrediting agency. We agree that elementary principles of administrative law call for significant, though not total, deference to decisionmaking by accreditation agencies. See Thomas M. Cooley Law Sch. V. Am. Bar Ass'n, 459 F.3d 705 (6th Cir. 2006); Wilfred Acad. of Hair & Beauty Culture v. S. Ass'n of Colls. & Schs., 957 F.2d 210 (5th Cir. 1992); see also Chi. Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schs. & Colls., 44 F.3d 447, 450 (7th Cir. 1994). Unfortunately, the district court applied this deferential standard in name only -- instead conducting what amounted to an improper de novo approach to the accreditation process.

A.

We begin the inquiry by considering the underlying claim at issue: that ACCSC violated PMTC's right to due process of law. Accreditation agencies are private entities, not state actors, and as such are not subject to the strictures of constitutional due process requirements. See e.g., Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Technical Schs., 817 F.2d 1310, 1314 (8th Cir. 1987) (finding that accreditation agency was "not governed by constitutional guidelines"); cf. Moore v. Williamsburg Reg'l Hosp., 560 F.3d 166, 179 (4th Cir. 2009) (setting framework for private entity's actions to be considered state action).

Moreover, "nearly every court to consider the issue" in the last three decades agrees that there is no express private right of action available to enforce the Higher Education Act ("HEA"), which governs the administration of federal student aid programs and the accreditation of institutions of higher education. McCulloch v. PNC Bank Inc., 298 F.3d 1217, 1221 (11th Cir. 2002) (finding that the HEA "does not expressly confer a private right of action," but only provides for suit by or against the Secretary of Education); see also Cooley, 459 F.3d at 710.

This is not to say however that accreditation agencies are wholly free of judicial oversight. They, like all other bureaucratic entities, can run off the rails. We thus recognize, along with our sister circuits, that there exists a "common law

12

duty on the part of 'quasi-public' private professional organizations or accreditation associations to employ fair procedures when making decisions affecting their members." McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 534-35 (3d Cir. 1994); see also Cooley, 459 F.3d at 711-12; Wilfred, 957 F.2d at 214; Med. Inst. of Minn., 817 F.2d at 1314 (finding that accreditation agencies "nevertheless must conform [their] actions to fundamental principles of fairness"); Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colls. & Secondary Schs., Inc., 432 F.2d 650, 655-58 (D.C. Cir. 1970).

Courts began to recognize this common law duty as early as 1938. See Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design, 244 F.3d 521, 527 (6th Cir. 2001) (quoting North Dakota v. N. Cen. Ass'n of Colls. & Secondary Schs., 99 F.2d 697, 700 (7th Cir. 1938) (noting that courts will not uphold accreditation decisions if "arrived at arbitrarily and without sufficient evidence")). The duty was meant to operate as a "check on organizations that exercise significant authority in areas of public concern such as accreditation and professional licensing." Cooley, 459 F.3d at 712.

The common law duty has several underpinnings. Congress, in the Higher Education Act, delegated to accreditation agencies a decisionmaking power that affects student access to federal

13

education funding. Accreditation, as noted, is a prerequisite to Title IV funding and it provides assurance that the federal loans and grants are awarded to students who will get the education for which they are paying.  By the same token, the cost to an educational institution and its students of denial of accreditation can be steep. An institution denied accreditation is likely to "promptly [go] out of business -- as very few people [are] willing [or able] to pay" tuition out of their own pockets. Chi. Sch., 44 F.3d at 448.  The denial of accreditation to an institution may also diminish the value of a degree earned there by students in past years. So the accreditors wield enormous power over institutions -- life and death power, some might say -- which argues against allowing such agencies free rein to pursue personal agendas or go off on some ideological toot. Their duty, put simply, is to play it straight.

The federal common law duty on accreditation agencies also derives in part from the fact that Congress has given exclusive jurisdiction to United States district courts over "any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency . . . involving the denial, withdrawal, or termination of accreditation." 20 U.S.C. § 1099b(f). We recognize that "the vesting of jurisdiction in the federal courts does not in and of itself give rise to authority to formulate federal common law."

14

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981); see also *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 591 (1973). However, it is hard to imagine that Congress intended federal courts to adjudicate only state law claims at the same time it prohibited state courts from participating. We are not alone in this supposition. See *Cooley*, 459 F.3d at 712 ("This grant of exclusive federal jurisdiction necessarily implies that federal law should govern disputes relating to decisions made by [accrediting agencies]." (citation omitted)); *Chi. Sch.*, 44 F.3d at 449 ("If a grant of federal jurisdiction sometimes justifies creation of federal common law, a grant of exclusive federal jurisdiction necessarily implies the application of federal law.").

However, recognition that such a common law duty exists does not authorize courts to undertake a wide-ranging review of decisionmaking by accreditation agencies. The other circuits that have recognized this common law claim have consistently limited the judicial inquiry, drawing on principles of administrative law and judicial deference. See *Cooley*, 459 F.3d at 712; *Chi. Sch.*, 44 F.3d at 449-50; *Wilfred*, 957 F.2d at 214; *Med. Inst. of Minn.*, 817 F.2d at 1314-15. Of course, we do not go so far as to say the ACCSC is equivalent to a federal agency. See *Cooley*, 459 F.3d at 712. But, "while the [APA] does not specifically apply to [the accrediting agency], principles of

15

administrative law are useful in determining the standard by which we review the [agency's] decision-making process." Id.; see also Chi. Sch., 44 F.3d at 450. Furthermore, while the amendments to the HEA in 2008 and 2010 made changes to the accreditation process, by strengthening, inter alia, the level of independent agency review, nothing in those amendments purported to alter the level of judicial scrutiny established by the above decisions. See Higher Education Opportunity Act, Pub. L. No. 110-315, 122 Stat. 3078 (2008)(codified as amended 20 U.S.C. § 1099b(a)(6)(2008)).

The most familiar standard of review is one in which the court is authorized to consider "only whether the decision of an accrediting agency such as [ACCSC] is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence." Cooley, 459 F.3d at 712. Under this standard, courts are "not free to conduct a de novo review or to substitute their judgment for the professional judgment of the educators involved in the accreditation process." Wilfred, 957 F.2d at 214.

B.

We adopt the above standard, in part, because there is value to be gained in the uniformity of standards of review throughout the circuits. However, while we think our sister circuits correct, we do not embrace uniformity for uniformity's

16

sake. The quasi-public nature of the accrediting institutions and their wide-ranging expertise in what may be highly technical and specialized fields of education also provide justification for a deferential standard.

Although accreditation agencies do serve an important quasi-public role in the dispersal of federal student aid funding, they are also private entities. The U.S. Department of Education does not itself accredit educational institutions, instead relying on a number of select nationally recognized accrediting agencies that the Secretary of Education deems to be "reliable authorit[ies] regarding the quality of the education or training provided by" schools. 34 C.F.R. § 602.16(a). Accrediting agencies must go through a certification process set up by the Department. The procedures and standards of accreditation set by the agency must "meet[] criteria established by the Secretary" in order to ensure they are a "reliable authority." 20 U.S.C. § 1099b(a).

In totality, the accreditation process operates as an instrument of quality control on educational institutions. While the visit of the accreditor may be as unwelcome as that of the auditor, accreditation does encourage institutional self-examination and the attainment of high standards. It also gives the public some assurance that professionals have received the

training commensurate with their responsibilities in the workplace.

As with federal administrative agencies, the accreditation agency's expertise and knowledge merits a measure of deference from generalist federal courts. See, e.g., Chevron U. S. A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). ACCSC provides a representative example; staff members, Commissioners, and volunteers have significant knowledge not just about the accreditation process and education generally but also in the specialized fields under review. The Commission itself is comprised of proprietors and executives of career-oriented institutions of higher education as well as individuals with expertise in education, training, and employment.

The agency's executive staff have experience with the accreditation process as well as with higher education, including but not limited to "curriculum development, faculty and academic administration, and distance learning," "regulatory issues . . . including changes to, and interpretations of, federal regulations that pertain to accrediting agency recognition," and "nonprofit management experience." J.A. 3019-21. ACCSC also relies on occupational specialists with training and involvement in the field of study for each school as part of the on-site visits. Here, for example, the 2010 on-site evaluation team included the director of for-profit career

18

training schools, an associate professor from the University of North Texas, a massage therapist and esthetician, a representative from the Missouri Department of Higher Education, and representatives from ACCSC staff with expertise in the accreditation process and compliance with ACCSC Standards. In the accreditation process, these experts perform important fact-finding missions akin to investigative undertakings at federal agencies. They review self-evaluations from applicants, conduct on-site visits, and work with institutions to improve areas of weakness in order to meet accreditation standards.

Although judicial oversight of the accreditation process surely has its place, it is not realistic to think courts possess either the expertise or the resources to perform the accreditation function ab initio. The range of specialized subjects taught at all levels of higher education is vast, and the prospect that courts can replicate the required knowledge on the bench is dim. We thus do not presume to be equipped to "substitute [our own] judgment for the professional judgment of the educators involved in the accreditation process." Wilfred, 957 F.2d at 214. As the Fifth Circuit noted, the "standards of accreditation are not guides for the layman but for professionals in the field of education." Id. (quoting Parsons Coll. v. N. Cent. Ass'n of Colls. & Secondary Schs., 271 F. Supp. 65, 73 (N.D. Ill. 1967)). In fact, due process claims

dovetail nicely with administrative law concepts of substantial evidence and arbitrary and capricious review because the prominent point of emphasis of due process is one of procedure. When adjudicating common law due process claims against accreditation agencies, courts should "focus primarily on whether the accrediting body's internal rules provide[d] a fair and impartial procedure and whether it [followed] its rules in reaching its decision." Id.

## III.

The district court's review here did not adhere to the appropriate standard in a number of regards. The court greatly expanded the administrative record, held a full multi-day bench trial, received depositions and live testimony in a way that sought to make itself the primary investigator and finder of fact, and went far beyond the focus on procedural fairness to refashion the accreditation decision on the merits. To that end, the district court was remedially aggressive not only in its awarding of a large amount of damages, but also in ordering that the institution in question be reaccredited, thereby overturning the judgment and expertise of an agency that in this case rested on a sound and supportable basis. All in all, and without question, the district court conducted an impermissible de novo review.

20

A.

Judged by the appropriate standards, the accreditation denial was in fact a permissible one. Indeed, we hold that the agency did not act in an arbitrary and capricious manner but rather "conform[ed] its actions to fundamental principles of fairness" through both the procedural and substantive standards it employed in making the accreditation decision. Med. Inst. of Minn., 817 F.2d at 1314.

ACCSC provided PMTC with significant procedural opportunities to make its case over the course of almost two years prior to the revocation of accreditation. Following the first on-site visit in 2010, the Commission issued a Probation Order even though it was not required prior to denial. J.A. 4781. It then conducted a second on-site evaluation to give PMTC an additional opportunity to demonstrate that the school was meeting the Commission's metrics for accreditation. Following that visit, the Commission issued a second Probation Order. PMTC was given the opportunity to, and did, respond in writing to each of the reports detailing the school's deficiencies following both on-site visits and both Probation Orders. The school submitted hundreds of pages of documentation for the agency to consider. ACCSC also repeatedly granted the school's requests for additional time to submit its responses. The decision to revoke PMTC's accreditation was unanimous and the

21

rationale was provided to PMTC. Subsequent to the revocation, Mee, accompanied by an attorney, filed a written appeal and appeared before an independent appeals panel, which affirmed the denial.

In addition to providing numerous procedural safeguards, ACCSC measured PMTC's performance against discernible substantive standards embodied in the Standards of Accreditation. Most importantly in this case, ACCSC's Standards of Accreditation require that accredited schools "have adequate management and administrative capacity in place" that includes:

> a. Full-time on-site supervision by an individual or team with the appropriate combination of education, experience, and demonstrated ability to lead and manage a post-secondary educational institution;
> b. Owners, members of school management, and administrative employees who are qualified for their particular roles and who possess the appropriate education, training, and experience commensurate with the level of their responsibilities;
> c. A sufficient number of managers and administrative employees necessary to support the school's operations, student services, and educational programs; and
> d. Appropriate administrative and operational policies and procedures to which the school adheres and reviews and updates as needed.

J.A. 4799 (ACCSC Standards Ch. 2 § I(A)(1)(a)-(d)). In addition, the Standards require that the school ensure "the continuity of management and administrative capacity" through "the reasonable retention of management and administrative staff." Id. (ACCSC Standards Ch. 2 § I(A)(4)).

22

Also at issue here, the Standards necessitate that to be accredited a school must provide a learning resource system that "include[s] material commensurate with the level of education provided and appropriate to the courses of study in sufficient quantity and scope to meet the educational objectives of each program." Id. at 4805 (ACCSC Standards Ch. 2 § II(A)(6)(a)). More specifically, such resources "must be integrated into a school's curriculum and program requirements" and "must be managed by qualified school personnel with sufficient experience to provide oversight and supervision." Id. (ACCSC Standards Ch. 2 § II(A)(6)(b), (c)). In addition, the Standards outline faculty and administrator qualifications and require that "[t]he school must verify prior work experience and maintain documentation of academic credentials of all faculty members and administrators . . . to demonstrate compliance with applicable [qualification] Standards." Id. at 4814 (ACCSC Standards Ch. 2 § III(A)(4)).

Furthermore, the Commission outlines additional Standards in strategic planning, financial stability and responsibility, tuition, admissions and recruiting policies, degree program qualifications, student achievement metrics, student loan repayment programs, and physical facilities, among others. See id. at 4799-4834.

The district court took issue with the generality of these Standards, particularly the management requirements, finding Chapter 2, Section I(A)(1)(c) to be "internally inconsistent," especially with regard to how a school can predict what constitutes a "sufficient" number of management staff "necessary" to support the school's operations. Prof'l Massage Training Ctr., Inc. v. Accreditation Alliance of Career Schs. & Colls., No. 1-12-cv-911, 2014 WL 201879, at *7 (E.D. Va. Jan. 17, 2014). The district court explained that it "[could not] imagine how a school seeking to gain or maintain accreditation would obtain practical guidance" from the Standards. Id.

The Standards are often general in nature, but we do not think to the point of invalidity. It was not necessary, or indeed practical, for the Standards to outline more specific numerical goals for management and staff. Instead, it was permissible for the Standards to retain some element of flexibility. ACCSC accredits nearly 750 educational institutions nationwide of many different sizes and types. A more specific numerical requirement with regard to how many management personnel are sufficient would be nearly impossible to dictate. ACCSC must maintain a balance between specificity, to provide notice to those seeking accreditation, and generality, to allow itself flexibility in accrediting varied institutions ranging over many different fields and disciplines. Rewriting the

24

Standards to contain more specific numerical requirements could actually harm educational institutions themselves, requiring many fine programs and good colleges to reach targets that are financially not sustainable, especially if tuition is to remain at affordable levels. See Ambrose v. New England Ass'n of Schs. & Colls., Inc., 252 F.3d 488, 495 (1st Cir. 2001) ("In constructing such benchmarks, standards that are definitive in theory easily may become arbitrary in application. Flexibility blunts the sharp edges of this potential hazard."); Med. Inst. of Minn., 817 F.2d at 1314 ("Strict guidelines would strip . . . [the accreditor of] the discretion necessary to adequately assess the multitude of variables presented by different schools.").

Given the procedures afforded to PMTC, including the opportunities it had to demonstrate compliance and the time it was given to make improvements and meet ACCSC's Standards, we cannot say the accreditation revocation was arbitrary and capricious. PMTC was afforded ample notice that it was not in compliance with ACCSC's Standards and numerous opportunities to remedy identified deficiencies. We do not think due process required more than that.

B.

Furthermore, the denial decision was clearly supported by substantial evidence. The Supreme Court has defined substantial

25

evidence to be anything "more than a mere scintilla" provided that a "reasonable mind might accept [the evidence] as adequate to support a conclusion." Almy v. Sebelius, 679 F.3d 297, 301 (4th Cir. 2012) (internal quotations omitted) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Federal courts do not undertake to "re-weigh conflicting evidence, make credibility determinations, or substitute [their] judgment" for that of the agency. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). In considering whether the denial was supported by substantial evidence, we confine ourselves to the record that was considered by the accrediting agency at the time of the final decision.

Under the ACCSC Standards, accreditation can be revoked in a case of "[f]ailure to demonstrate compliance with the Standards of Accreditation or other accreditation requirements." J.A. 4783 (ACCSC Standards Ch. 1 § VII(P)(1)(b)). Here, PMTC demonstrated multiple and continued failures in a number of areas. The 2010 on-site evaluation Team Summary Report listed thirteen areas in which the school failed to comply with ACCSC Standards. Although the school made progress in some areas, it continued to fall short with regard to sufficiency and continuity of management, as well as with its learning resource system and the verification of faculty credentials. See id. at 2377-83.

26

The continuity and sufficiency of management and staff presents the most obvious deficiency in PMTC's application for accreditation. The ACCSC Standards require "adequate management and administrative capacity" that includes "[f]ull-time on-site supervision by an individual or team with the appropriate combination of education, experience, and demonstrated ability to lead and manage." Id. at 4799. In addition, "the continuity of management and administrative capacity [must be] ensured through the reasonable retention of management and administrative staff." Id. The record is replete with evidence that PMTC failed to comply with these requirements.

In response to the 2010 Probation Order, PMTC acknowledged that eight of its sixteen administrative employees had been employed at the school for less than a year, that in the previous year it had fired two School Administrators within their first ninety days, and that three other employees had been terminated recently. Id. at 1809. In August 2011, the 2011 Team Summary Report following the second on-site visit noted that the school had "had three administrators in the previous nine months" and found that while Juliet Mee provided "a constant influence as the school's director," the "shifting management structures [had] had a negative impact on the operation of the school." Id. at 1886.

27

At the time of the 2011 on-site visit, PMTC again presented a new management team which included Juliet Mee, Rebecca Cox (who was hired as School Director in June of 2011), and April Durnell (hired as School Administrator in March of 2011) and argued the new team would help to rectify ACCSC's concerns regarding the management and administration of the school. Id. at 1884; see also id. at 2378. However, by December 2011, as explained in PMTC's response to the Commission's second Probation Order, both Cox and Durnell had already been terminated due to a "poor job match" and the "evasion of relevant information" respectively. Id. at 2225; 2378.

Despite this upheaval, the Commission extended the evaluation period for PMTC twice, placing the school on probation following both the 2010 and 2011 on-site evaluations on the grounds that "additional information was necessary in order to determine the school's compliance with accrediting standards." Id. at 2377. In response, PMTC repeatedly presented ACCSC with new and shifting management structures. By December 2011, in response to the second Probation Order, the school listed its management team as Juliet Mee, Owner/School Director, Jeremiah Mee, Director of Finance, Jeremy Beatty, Compliance Administrator, and Linda Mayhugh, Curriculum Administrator. Id. at 2187, 2378-79.

ACCSC expressed concern in its written explanation of the denial that Jeremiah Mee, the brother of Juliet Mee, who started as Director of Finance in August 2011, had made clear that he was buying his own firm and intended to "guide and direct the hiring of a new on-site Director of Finance," implying he too would soon be leaving. Id. at 2378. In addition, the Commission found that PMTC "failed to demonstrate" that Jeremy Beatty and Linda Mayhugh met either the school's qualifications for their administrative positions or that either was "qualified to meet the Commission's expectations to serve in this capacity." Id. at 2379. Thus, even after multiple opportunities to remedy the deficiency, the final management structure submitted in response to the 2011 Probation Order still presented problems. See id. at 2379; see also id. at 1896, 2099, 2163, 2179-81, 2205-2224, 2228.

The District Court took issue with this conclusion, and stated that ultimately, Juliet Mee's role as the "primary manager of PMTC since she founded the school in 1994" should have satisfied ACCSC's management standards. Prof'l Massage Training Ctr., 2014 WL 201879 at *6-*8. While it may be true that "the Standards of Accreditation do not require multiple staff members [to constitute adequate management]," id. at *6, the record abounds with evidence of repeated and ongoing turnover. Given the turmoil in administrative and management

29

staff at PMTC, it would stretch the imagination, to say the least, to credit PMTC's contention that ACCSC lacked substantial evidence to support its decision. There is more than a "mere scintilla" of evidence that PMTC's management and administration was in shambles. Almy, 679 F.3d at 301.

We note also that in reviewing for substantial evidence, it is not within the purview of this court to measure whether Juliet Mee as an individual manager was sufficient to comply with Chapter 2, Section I(A)(1)(a)-(d) or to what degree her presence might provide for "continuity of management and administrative capacity" in light of the significant staff turnover. J.A. 4799 (ACCSC Standards Ch. 2 § I(A)(4)). Nor do we profess any expertise as to what extent an educational institution can ignore its own stated job qualifications when hiring underqualified management without running afoul of the Standards for management personnel.

In sum, the well-documented disorder, constant turnover and questionable qualifications of PMTC's management staff provided substantial evidence that the school was out of compliance with accreditation Standards. The record also provides substantial evidence to support the Commission's additional findings of deficiencies regarding both the learning resource system and the faculty qualification verification processes. See id. at 2380-83.

In the Team Summary Report following the 2010 on-site evaluation, ACCSC explained that a significant number of students surveyed during the evaluation reported "dissatisfaction with the school's learning resource system." Id. at 1464. Students said that the "library [was] not adequate for their educational needs," and "they [did] not have access to the library resources at Missouri State University (MSU) as advertised by the school." Id.; see also id. at 1788-89. While the 2011 Probation Order found that PMTC had made satisfactory progress on the materials available, PMTC still did not demonstrate that "the school's learning resource system [was] managed by qualified school personnel" or that "use of the learning resource system materials [was] integrated into the school's curriculum and program requirements." Id. at 2162. PMTC hired a part-time administrator to manage the learning resource system prior to its response to the 2011 Probation Order, but stated that it did not "feel that [it would] need a full time person who dedicate[d] themselves 100% to the Learning Resource System until [it was] able to increase the resources within the on-site facility." Id. at 2264. The Commission took this admission as acknowledgment that the learning resource system "continued to be out of compliance with accrediting standards." Id. at 2381.

In addition, the 2010 Team Summary Report also noted that "[t]he school did not demonstrate that the prior work experience of faculty members [was] verified or that the school maintain[ed] documentation of academic credentials of all faculty members" in violation of Chapter 2, Section III(A)(4). Id. at 1464. In the 2010 Probation Order, ACCSC explained that PMTC had submitted some examples of instructor files to demonstrate faculty qualifications, but had failed to provide documentation that such credentials were verified for all faculty members. Id. at 1789-90. In response, PMTC provided only blank verification forms and an explanation of how the process should be completed. See id. at 1872, 2303, 2382.

The 2011 on-site evaluation team found that these forms were not consistently completed and that April Durnell was marking faculty qualifications as verified when she had "conducted the verification process, even if she had not been successful in verifying the information provided by the instructor." Id. at 1892. The results of the team's review indicated that some faculty members' qualifications had been verified in June of 2011, but many faculty members' backgrounds remained unverified. Id. at 1892-93, 1897-98. The record supports ACCSC's conclusion that PMTC "failed to properly address" the concern that the school did not verify faculty qualifications nor maintain adequate documentation in violation

of the Standards Chapter 2, Section III(A)(4). Id. at 2383. It is not surprising that an accreditation agency would find recurring questions about something so elementary as faculty qualifications to be problematic. It is basic to the functioning of an educational institution that the qualifications of its teachers and instructors be both accurate and available.

C.

PMTC contends, and the district court agreed, that bias against the school on the part of the ACCSC staff members justified a less deferential inquiry into the agency's decisionmaking and resulted in a denial of due process owed to the school. See Appellee's Br. 45-48; Prof'l Massage Training Ctr., 2014 WL 201879, at *7 ("Deeply negative staff bias against Ms. Mee completely infected the record that the commission reviewed and as a result denied PMTC due process.").

This court has made clear that an "impartial decisionmaker is an essential element of due process." Morris v. City of Danville, 744 F.2d 1041, 1044 (4th Cir. 1984) (quoting Bowens v. N.C. Dept. of Human Res., 710 F.2d 1015, 1020 (4th Cir. 1983)). That ACCSC is a private entity (albeit one with significant public responsibilities) does not alter this imperative. And although we are considering a common law due process claim rather than a constitutional one, a "fair trial in a fair tribunal" remains a basic requirement of due process. Withrow v.

33

Larkin, 421 U.S. 35, 46-47 (1975) (internal quotations and citations omitted) (applying the due process requirement of an unbiased tribunal to administrative agencies). A federal court may be justified in conducting a more searching inquiry into the motivations of administrative decisionmakers in the case of "a strong showing of bad faith or improper behavior." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). However, the evidence presented here does not rise to that level.

An administrative decisionmaker "[is] entitled to a 'presumption of honesty and integrity.'" Morris, 744 F.2d at 1044 (quoting Withrow, 421 U.S. at 47). However, personal bias may disqualify an adjudicator if it "stem[s] from a source other than knowledge . . . acquire[d] from participating in a case." Bowens, 710 F.2d at 1020. As the Supreme Court has explained, "various situations have been identified in which experience teaches that the probability of actual bias on the part of the [agency] is too high" to allow the adjudicator to consider the case. Withrow, 421 U.S. at 47. For instance, the potential for bias is impermissibly high in "those [cases] in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of [prior] personal abuse or criticism from the party before him." Id. (internal citations omitted).

34

Neither of those situations is present here. There was no pecuniary interest at stake for members of the Commission, nor were any members of the Commission targeted for abuse by Juliet Mee or PMTC prior to the proceeding. In fact, there is no allegation that the individual members of the Commission themselves were biased or had an identifiable conflict of interest.

Rather, PMTC alleges that frustration and dislike of Juliet Mee by the staff at ACCSC influenced the creation of the record on which the Commission relied when casting its vote for revocation of PMTC's accreditation. See Appellee's Br. at 53-54. PMTC cites to a number of instances in which ACCSC staff members expressed frustration with Mee or a negative opinion of PMTC's application. However, the "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display" are not sufficient to "establish[] bias or partiality." Liteky v. United States, 510 U.S. 540, 555-56 (1994); see also Consolidation Coal Co. v. Williams, 453 F.3d 609, 620 (4th Cir. 2006) ("[T]he tone and tenor of frustration expressed in the ALJ's comments do not, in and of themselves, establish bias."). An unfavorable impression of an applicant on the part of the accreditation agency is likewise not bias. To find otherwise

would render every denial of accreditation subject to a searching inquiry for lack of impartiality.

As evidence of bias, PMTC primarily points to emails and testimony where ACCSC staff members, primarily Lisa Miles, Christopher Lambert, and Sean Forman,[1] expressed an alleged "disdain for PMTC and for Juliet Mee." Appellee's Br. at 53. In addition, the school contends that Miles failed to present to the Commission two binders of documents that were provided to her during the 2011 on-site visit and that she instead took them to her home and destroyed them. See id.; see also J.A. 2819. The district court found there was evidence sufficient to support the claim that ACCSC staff "intentionally drafted the report in a negative light to cause the commissioners to vote to withdraw PMTC's accreditation." Prof'l Massage Training Ctr., 2014 WL 201879, at *7.

---

[1] Lisa Miles was a Manager of Accreditation at ACCSC and served as part of the on-site evaluation teams in both 2010 and 2011. She was responsible for editing and drafting, respectively, the Team Summary Reports following the each visit. See J.A. 243, 1455, 1874, 3022. Christopher Lambert served as ACCSC's Director of External Affairs and here supervised the process of drafting the Compliance Summary presented to the Commission prior to its vote and the written explanation for the revocation sent to Mee. Id. at 3020; see also id. at 2826-76 (correspondence between Forman and Lambert and partial drafts of revocation letter and Compliance Summary). Sean Forman was a Senior Analyst for Institutional Review and Development and here participated in the drafting of the Compliance Summary and of the 2012 revocation letter under Lambert's supervision. See id. at 2826-76.

We think this is not a balanced characterization of the record. Emails between staff members revealed that Mee was upset by the possibility that PMTC might lose accreditation and was often difficult to deal with or even hostile. See, e.g., J.A. 2821-23, 2866. However, staff frustration with Mee, justified or not, is not dispositive evidence of bias. Furthermore, the record does not demonstrate that ACCSC was impermissibly building a case against PMTC. The emails between Lambert and Forman paint a picture of a subordinate and supervisor discussing and revising the drafts of the Compliance Summary (which is presented to the Commission prior to the vote) and the revocation letter. See, e.g., id. at 2826-39, 2866-74, 2886. Discussions of this sort are inevitable if the staff is to do its job.

Due process requires that the basis for revocation of accreditation be provided in writing and supported by the evidence. We see nothing sinister in Forman's raising with his supervisor areas where he had questions about which evidence to include in the written document or with Lambert asking his subordinate to strengthen his explanation for certain findings.[2]

---

[2] PMTC argues that the email correspondence between Forman and Lambert demonstrates that ACCSC was building a case against them by purposefully including statements Forman knew to be false in the record put before the Commission. This assertion is simply not supported by the record. When he was drafting the (Continued)

There is no evidence that information was improperly included or omitted. Again, this type of back and forth is commonplace in the drafting of any statement of reasons in the administrative process. Furthermore, as we have noted, the evidence, including submissions PMTC itself made to the Commission, supported ACCSC's findings, especially with regard to fundamental

revocation letter, Forman wrote to Lambert raising a number of questions about the draft. He did express concern that the tie between "the [learning resource system] supervision" and the "difficulties verifying faculty work experience" and the ongoing administrative and management failures at PMTC was "fairly weak in the grand scheme of things." J.A. 2870. He also noted when drafting the Compliance Summary that given Jeremy Beatty's experience, it might be "a stretch to state that Mr. Beatty may not have 3 years experience." Id. at 2854. Appellant has given us no reason to take these comments to be anything other than instances of a subordinate asking a supervisor for advice on a tough call. In the course of this correspondence, Forman had explained that PMTC had provided some evidence of compliance but noted the school "also fell short in many areas." Id. at 2860. Lambert gave Forman guidance in response to his questions, directing him to "strengthen [the] finding on faculty verification" prior to finalization of the letter. Id. at 2867. He also noted places where Forman needed additional evidence to support his assertions. Id. Lambert explained to Forman that "management [had] been a long standing issue at the school, one that the Commission [had] afforded multiple opportunities" for PMTC to rectify, id. at 2887, and that the revocation rationale was to focus on "the management issue that [the Commission] was building around," id. at 2872. Lastly, Lambert, when sharing the final draft of the letter with his colleagues, wrote that it was "compelling." Id. at 2866-67. Again, we are given no reason to read comments commending Forman's work as anything more than routine praise from a supervisor to a subordinate upon completion of an assigned task. Id. at 2837 ("Nice, Sean"). The emails simply fail to present the kind of case of improper motivation or bad faith on the part of the Commission or its staff members necessary to demonstrate bias.

management issues. Compare id. at 2378 (explanation of management staff turnover in the revocation letter) with id. at 2225 (evidence of management staff turnover submitted by PMTC).

PMTC also makes much of the fact that Lisa Miles took home two binders of information given to her by Juliet Mee during the school's second on-site visit instead of presenting them to the Commission. However, the record suggests Miles did in fact rely on the binders when drafting the 2011 Team Summary Report which was included in the record before the Commission. See id. at 2819. In addition, the Commission only considers official submissions, which must be filed with the Commission electronically. See id. at 4745 (Standards Ch. 1 § I(E)(1)(b)); see also, e.g., id. at 1453 (response to Team Summary Report due electronically). There is no suggestion that it would consider every document handed to an on-site evaluation team member. In both the 2010 and 2011 Team Reports, as well as the 2010 and 2011 Probation Orders, PMTC was notified that it must "submit its response in an electronic format," id. at 1453 (2010 Team Summary Report); see also id. at 1791 (2010 Probation Order), 1875 (2011 Team Summary Report), 2167 (2011 Probation Order), and it did formally submit portions of the binders to ACCSC, id. at 758, 1829-49 (PMTC response to 2010 Probation Order).

In conclusion, there was not sufficient evidence that ACCSC was motivated by bias to justify departure from the deferential

39

standard ordinarily due to the accreditation agency under a common law due process claim. Because we find that ACCSC did not act arbitrarily or capriciously and grounded its revocation on substantial evidence, we conclude that the accreditation agency did not deprive PMTC of its right to due process of law.

IV.

Last, PMTC cross-appeals the district court's holding that it was not entitled to relief on any of its state law claims for breach of contract, negligence, and tortious interference with a contract and with a prospective business or economic advantage. See Prof'l Massage Training Ctr., 2014 WL 201879, at *8. We agree with the district court that these claims fail as a matter of law, and we affirm its holding in this regard.[3]

Virginia's choice-of-law rules determine what law to apply. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496

---

[3] ACCSC contends that state law claims are not cognizable grounds to challenge an accreditation decision. See Appellant's Response-Reply Br. at 47-48. ACCSC would have us follow the example set by the Seventh Circuit, which found that because federal courts have exclusive jurisdiction to hear challenges to accreditation decisions under 20 U.S.C. § 1099b(f), it is not possible for such courts to "apply state law to the actions of accrediting agencies when state courts have been silenced." Chi. Sch., 44 F.3d at 449. We agree that a serious question of cognizability exists with respect to PMTC's state law claims. However, we need not decide today the broader question as to whether Congress intended to preempt state law causes of action through the grant of exclusive federal jurisdiction in § 1099b(f), because the state law claims here are meritless on their own accord.

(1941). The parties agree that Virginia law applies to the breach of contract claim inasmuch as the contract was made in Virginia, see Lexie v. State Farm Mut. Auto. Ins. Co., 469 S.E.2d 61, 63 (Va. 1996), but that Missouri law governs the tort claims as that was the place where the alleged tort was committed, see Jones v. R.S. Jones & Assocs., Inc., 431 S.E.2d 33, 34 (Va. 1993).

The district court did not err in finding that PMTC's contract claim fails as a matter of law. The Standards of Accreditation do not constitute a binding contract between the agency and the accredited educational institutions because the Commission can alter the alleged "contract" at will and, thus, is not bound by its terms. See J.A. 4790 (ACCSC Standards, Ch. 1 § IX(A)(1)). Under Virginia law, "[b]oth parties must be bound or neither is bound." Town of Vinton v. City of Roanoke, 80 S.E.2d 608, 617 (Va. 1954) (quoting Am. Agric. Chem. Co. v. Kennedy & Crawford, 48 S.E. 868, 870 (Va. 1904)). And, even assuming arguendo that a valid contractual relationship exists between an educational institution and an accrediting agency, PMTC has still failed to point to any specific term or condition that ACCSC impermissibly breached. ACCSC had an unquestionable right to revoke PMTC's accreditation if compliance with the Standards was not demonstrated. See J.A. 4783 (ACCSC Standards Ch. 1 § VII(P)(1)(b)). Exercising one's lawful rights is not a

41

breach of contract. In addition, for the reasons set forth above, in Section III.C, PMTC has not demonstrated that ACCSC exercised any contractual discretion in bad faith, even in the highly dubious event that a "contract" between the parties existed.

PMTC's state law tort claims suffer a similar fate to that of its breach of contract claims. PMTC's negligence claim fails as a matter of law because, as the district court found, it is foreclosed by the economic loss doctrine. See R.W. Murray Co. v. Shatterproof Glass Corp., 697 F.2d 818, 829 (8th Cir. 1983) (concluding that the economic loss doctrine "precludes the appellants from pursuing a negligence cause of action seeking recovery for only economic loss"). PMTC's three additional state law claims allege tortious interference with a contract and with a prospective business or economic advantage.

Under Missouri law, tortious interference "requires proof of: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." Nazeri v. Mo. Valley Coll., 860 S.W.2d 303, 316 (Mo. 1993) (en banc). The district court properly found that PMTC cannot show a lack of justification. The record is replete with evidence of continued failure by the school to meet the Standards of Accreditation, which gave ACCSC

42

"an unqualified legal right" to revoke PMTC's accreditation. Id. at 317; see also J.A. 4783 (ACCSC Standards Ch. 1 § VII(P)(1)(b) (grounds for revocation)).

Under Missouri law, a plaintiff can "establish a lack of justification" where "the defendant employed improper means in seeking to further only his own interests." Nazeri, 860 S.W.2d at 316-17; see also Stehno v. Sprint Spectrum, L.P., 186 S.W.3d 247, 252 (2006) (en banc). PMTC contends on appeal that the school is entitled to relief because staff bias at ACCSC led to a "misrepresentation of facts" in the record relied on by the Commission. Appellee's Reply Br. at 10; see also Nazeri 860 S.W.2d at 317 ("[I]mproper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact . . . ."). However, as we explained above, there is insufficient evidence of any impermissible bias in this case. Because PMTC cannot demonstrate that improper means were employed, it has not met its burden of proof with regard to the tortious interference claims. As such, we affirm the district court's finding that PMTC was not entitled to relief on its state law tort claims as a matter of law.

V.

For the foregoing reasons, we believe that ACCSC acted lawfully in revoking PMTC's accreditation. The district court's

43

ruling to the contrary is reversed, and we remand to that court with directions to enter judgment in ACCSC's favor on PMTC's due process claim and to dismiss the case.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED WITH INSTRUCTIONS